```
 1                FRANZ SKRYANZ
 2       A.   Yes.
 3       Q.   What part of that letter
 4  refreshes your recollection on that point?
 5       A.   The third paragraph, that starts
 6  "Concurrently with the above," et cetera.
 7       Q.   That is what you are referring
 8  to?
 9       A.   Yes, sir.
10       Q.   The date of stock certificate
11  number 40 was what, when was that stock
12  issued?
13       A.   That stock was issued on
14  December 1, 2001.
15       Q.   When was it paid for?
16       A.   It was paid for actually in
17  three installments.  I don't recall the exact
18  dates.  One payment of $10,000 and one
19  payment of $15,000 and the one payment of
20  $50,000 was the one referred to in paragraph
21  three of the February 11, 2004 letter.
22       Q.   To your knowledge, did Xethanol
23  receive a check or wire transfer from the
24  Julianne C. Murphy Revocable Trust for the
25  amount of $50,000 on or about May 2, 2002?
```

FRANZ SKRYANZ

A. No, that is not how it happened.

Q. Tell me how it happened, sir.

A. Xethanol was at some point in early 2004 in need of funds. A company called MLP -- sorry, MLP Number One, controlled, to my understanding, by Julianne B. Murphy, was prepared to make that loan to Xethanol by, in turn, borrowing itself money from First Florida Bank and putting that money into an account that Xethanol had established at First Florida Bank.

Subsequently occurred that Xethanol did not need the loan. At that time the $175,000 had already been deposited into the Xethanol account. Mrs. Julianne B. Murphy saw to it that all but $50,000 of that loan was disbursed to other entities controlled by her.

And the $50,000 left in that account were represented for the payment of 500,000 shares of Xethanol.

Q. When Xethanol issued stock certificate number 40 on December 1, 2001, did at that time receive a payment for the

1        FRANZ SKRYANZ

2   stock?

3        A.    No, sir.

4        Q.    Pardon me?

5        A.    No, sir.

6        Q.    Did it receive a promissory note
7   or other commitment to in the future receive
8   money for that stock?

9        A.    None in writing that I know of.

10       Q.    Am I understanding you to tell
11  me that on December 1, 2001 Xethanol issued
12  250,000 shares to Thomas A. Thomas, but did
13  not receive the compensation for such stock?

14       A.    That is correct.

15       Q.    Am I understanding you to tell
16  me there is no written documentation that you
17  are aware of that assured Xethanol that it
18  would receive money in the future for that
19  stock?

20       A.    That is correct.

21       Q.    Was it customary for Xethanol to
22  issue stock for which it did not receive
23  payment?

24       A.    It had happened previously when
25  stock was issued and payment was received

1        FRANZ SKRYANZ

2   subsequently in the early stages of the --

3   initial stages of the company.

4        Q.   On these other occasions that

5   you are referring to, were there any written

6   commitments or obligations to later pay for

7   the stock?

8        A.   Not to my knowledge.

9        Q.   Was there any restriction or

10  limitation on Thomas A. Thomas as trustee to

11  deal with stock certificate 40 on, say,

12  January 1, 2002?

13       A.   I am sorry.  I do not understand

14  the question.

15       Q.   Stock certificate 40 was issued

16  on December 1, 2001; correct?

17       A.   Correct.

18       Q.   Are you aware of there being any

19  restrictions or limitations that would have

20  prevented Thomas A. Thomas as trustee as for

21  selling or otherwise disposing of that stock

22  on say January 1, 2002?

23       A.   None other than the customary

24  restrictions that are on the back of the

25  stock certificate.

```
 1                FRANZ SKRYANZ
 2        Q.    As far as you know, could
Mr. Thomas as trustee, could have sold the
750,000 shares of Xethanol stock the day
after he sold the stock certificate?
 6        A.    I suppose, I do not know.
 7        Q.    Let me go back to my original
question then.
                I believe you have told me that,
from your perspective the Julianne Murphy
Trust paid for the 750,000 shares of stock;
is that correct?
13        A.    That is correct.
14        Q.    On what basis then did you
believe that John J. Murphy was authorized to
direct Xethanol as to the cancellation and
re-issuance of that stock to other parties?
18        A.    On the basis of his letter to
Mr. Christopher Taylor, who in turn
instructed me to do that.
21        Q.    What was the underlying
authority that you recognize Mr. Murphy had
to give you that instruction?
24        A.    Mr. Murphy sent a letter to
Mr. Taylor and Mr. Taylor, who was my
```

1        FRANZ SKRYANZ

2   superior, instructed me to do that.

3        Q.   I understand.  But my question

4   is, did you have any understanding as to

5   Mr. Murphy's authority to request this

6   transaction?

7        A.   No, sir.

8        Q.   Did you ever discuss with

9   Mr. Taylor whether Mr. Murphy was authorized

10  to do this?

11       A.   I do not believe so.

12       Q.   Based on your communications

13  with Mr. Taylor, did you believe that he

14  recognized Mr. Murphy as having the authority

15  to make that request?

16            MR. ROTELLA:  Objection to the

17       form of the question.

18       Q.   You can answer, sir.

19       A.   Yes, sir, I did.

20       Q.   And you, in fact, carried out

21  that request?

22       A.   I am sorry?

23       Q.   You carried out that request?

24       A.   Yes.

25       Q.   I want to go back for a moment

```
 1              FRANZ SKRYANZ
 2    and talk about the three installments of the
 3    750,000 shares of stock.
 4              You said there was a payment for
 5    10,000, a payment for 15,000, and a third
 6    payment for 50,000; correct?
 7         A.   Yes, sir.
 8         Q.   Do you know from whom the
 9    initial $10,000 payment came from?
10         A.   No, I do not because the wire
11    transfer that comes to the bank only shows
12    the bank from which it came from, but not the
13    initiator of the transfer.
14              MR. SPIVEY:  Let me ask you to
15         hand the witness what will be marked
16         as Exhibit 39.
17              We are going to go out of order
18         here a little bit.
19              (Chapter 7 marked for
20         identification, Exhibit 39.)
21         Q.   The document I'm looking at,
22    sir, is entitled, "Third Party London
23    Manhattan Limited, Inc.'s Response to
24    Plaintiff's Second Subpoena to Produce."
25              Is that what you're looking at?
```

```
 1                FRANZ SKRYANZ
 2        A.   Yes, sir.
 3        Q.   Mr. Skryanz, do you see at the
 4   bottom of the document there is a tab that
 5   says Exhibit A?
 6        A.   Yes, I do.
 7        Q.   I ask you to flip to that,
 8   please.
 9        A.   I did.
10        Q.   On the first page you should see
11   is a bank statement for Xethanol Corporation.
12        A.   Yes.
13        Q.   Do you see that?
14        A.   Yes, I do.
15        Q.   I want you to go ten pages back
16   into the document.
17        A.   Yes.
18        Q.   And you should have in front of
19   you something entitled "Payments to the
20   Xethanol Corporation for the Purchase of
21   750,000 Shares of Common Stock."
22             Is that what you have?
23        A.   No, that is not what I have.
24   Oh, one page too far.  I now have it in front
25   of me.
```

```
 1                FRANZ SKRYANZ
 2       Q.   And the document you have in
front of you says "Payments to Xethanol
Corporation for the Purchase of 750,000
Shares of Common Stock"?
 6       A.   Yes.
 7       Q.   Did you prepare that page, sir?
 8       A.   Yes, I did.
 9       Q.   When did you prepare that?
10       A.   After receipt of your subpoena.
11       Q.   And did you rely on any records
to compile the information that appears on
that page?
14       A.   Yes, I did.
15       Q.   What records did you look at,
sir?
17       A.   The page right behind it, for
example.
19       Q.   Xethanol Corporation SB Checking
Account Report as of February 28, 2002?
21       A.   Yes, sir.
22       Q.   Were there any other documents
that you looked at to compile the tenth page
of the exhibits attached to Exhibit 39?
25       A.   The page immediately after
```

1        FRANZ SKRYANZ

2   Exhibit A, which is a First Florida Bank bank

3   statement.

4        Q.   What part of that bank statement

5   reflects any of the transactions that are

6   mentioned on the tenth page?

7        A.   The third payment.

8        Q.   I am sorry?

9        A.   The third payment, which says

10  "5-3-2002, First Florida Bank, MLP Number One

11  Limited, Julianne C. Murphy Revocable Trust,

12  5,000 shares, $50,000."

13       Q.   Sir, we may be looking at a

14  different page. I'm looking at something

15  that comes right after the Exhibit A tab;

16  correct?

17       A.   Yes, which is a bank statement.

18       Q.   Right.

19            And the bank statement that I'm

20  looking at is dated May 1, 2002 through

21  May 31st of 2002.

22       A.   Correct.

23       Q.   And you tell me what part of

24  this document reflects the transactions on

25  the tenth page of Exhibit 39.