1        FRANZ SKRYANZ

2   A.    This is the bank statement that
3   reflects what I had recounted earlier about
4   the $175,000 loan that was put into this bank
5   account, and from which Mrs. Julianne Murphy
6   caused a number of checks to be drawn, which
7   are shown on the page immediately above -- I
8   am sorry, behind the bank statement, which
9   then left $50,000 and change in the account,
10  which was payment for the 500,000 shares.
11       Q.    Relative to this Xethanol
12  Corporation account and First Florida Bank,
13  was Julianne Murphy an authorized signatory
14  on the account?
15       A.    No, she was not. John Murphy
16  was.
17       Q.    Were you the other authorized
18  signatory?
19       A.    Yes, I was.
20       Q.    When you say that Mrs. Murphy
21  caused money to be paid from this account,
22  what did you mean?
23       A.    That she must have, this is my
24  guess, instructed her husband to sign those
25  checks, of which copies are part of Exhibit

1    FRANZ SKRYANZ

2 A.

3   Q. To your knowledge, did
4 Mr. Murphy ever write a check to Xethanol for
5 the $50,000 that you referred to this
6 morning?

7   A. No, sir.

8   Q. Those checks that are part of
9 Exhibit 39, do you have those in front of
10 you?

11   A. Yes.

12   Q. Check number one, two, three,
13 four, five, six, seven, the memo section,
14 they all say "Repay loans."

15   Do you see that?

16   A. Yes, I do.

17   Q. Do you know what loans were
18 being repaid?

19   A. I have no idea, sir.

20   Q. Let's go back to the tenth page
21 of Exhibit 39, which is the document you
22 prepared in response to my subpoena; correct?

23   A. Correct.

24   Q. The first entry is dated
25 February 6, 2002. And under the source

```
1                FRANZ SKRYANZ
2    section it says "Sun Trust Bank (John
3    Murphy)."
4              Do you see that, sir?
5        A.   Yes.
6        Q.   What did you mean for that to
7    signify?
8        A.   That a payment was received from
9    Sun Trust Bank and that it was most likely
10   originated by John Murphy himself.
11       Q.   How about the next entry, dated
12   February 8, 2002, under the source section it
13   says "Bank of Central Florida (John Murphy)."
14             What did you understand that to
15   signify?
16       A.   The same as I said for the entry
17   above, that funds came from the Bank of
18   Central Florida and that the transfer, the
19   wire transfer must have been initiated by
20   Mr. Murphy.
21       Q.   On the third entry, dated May 3,
22   2002, it says "First Florida Bank (MLP Number
23   One, Ltd., Julianne C. Murphy Revocable
24   Trust)."
25             Do you see that?
```

```
                    FRANZ SKRYANZ
 1
 2        A.    Yes, sir.
 3        Q.    How was that $50,000 transferred
 4   to Xethanol?
 5        A.    It wasn't Xethanol's bank
 6   account, the remainder of that loan that I
 7   had referred to earlier.
 8        Q.    So there was no wire transfer
 9   for the entry dated May 3, 2002; correct?
10        A.    Correct.
11        Q.    And the Julianne C. Murphy
12   Revocable Trust did not directly send any
13   money to Xethanol on May 3, 2002; did it?
14        A.    No, sir.
15        Q.    And MLP Number One, Ltd. did not
16   directly send any money to Xethanol on May 3,
17   2002; did it, sir?
18        A.    No, sir.
19        Q.    Do you know whether Xethanol
20   consented to the $175,000 being deposited in
21   the account at First Florida Bank?
22        A.    As I mentioned earlier, Xethanol
23   intended to receive a loan, which it
24   subsequently did not need, and thus had
25   consented for the money to be put into that
```

```
1              FRANZ SKRYANZ
2   account.
3        Q.   I didn't hear the last thing you
4   said, sir, I apologize.
5        A.   It had originally consented for
6   the funds to be put into the First Florida
7   Bank account.  When it actually happened,
8   when the funds were deposited in there, it no
9   longer needed or wanted the loan.
10       Q.   To your knowledge, did
11  Mr. Taylor ever express displeasure over the
12  fact that this $175,000 was deposited into an
13  Xethanol account?
14       A.   He expressed displeasure as to
15  how this whole matter was handled, that there
16  were checks drawn on the account before we
17  actually found out that there were.
18       Q.   To whom did he express the
19  displeasure?
20       A.   To me, sir.  I don't know if he
21  expressed it to someone else.
22       Q.   Did he ever express to you any
23  displeasure with John Murphy for that series
24  of events?
25       A.   I would say indirectly, sir.
```

```
 1                FRANZ SKRYANZ
 2        Q.   And how would you characterize
 3   what he told you or expressed to you?
 4        A.   I would have to guess, sir, and
 5   I don't wish to do that.
 6        Q.   Give us your best --
 7        A.   This was so long ago, sir, I do
 8   not remember.
 9        Q.   I want to stay focused on the
10   tenth page of Exhibit 39, which is the
11   summary that you prepared.  And I want to
12   look at the top number, where it says "Number
13   of Shares."
14             Do you see that?
15        A.   Yes.
16        Q.   To your knowledge, did the
17   Julianne C. Murphy Revocable Trust ever have
18   a stock certificate for 150,000 shares?
19        A.   No, sir.
20        Q.   How about Thomas A. Thomas as
21   trustee?
22        A.   Not for 150,000, only for
23   750,000, which makes up the three items on
24   this page.
25        Q.   I want to go back to Exhibit 2
```

1        FRANZ SKRYANZ
2   and specifically Mrs. Murphy's letter to you
3   dated February 11, 2004.
4           Do you see that?
5       A.   Yes, sir.
6       Q.   In the third paragraph of the
7   letter she says, "Concurrently with the
8   above."
9           What day do you believe she is
10  referring to by "above"?
11      A.   That would have to be the date
12  of the loan, which would be May 31, 2002.
13      Q.   Would it be May 2, 2002, sir?
14      A.   I am sorry?
15      Q.   Would it be May 2, 2002?
16      A.   Could be.
17      Q.   Looking at the first paragraph
18  of the letter dated February 11, 2004 --
19      A.   May 2nd, yes, sir.
20      Q.   -- do you believe that is the
21  date that she is referring to?
22      A.   Yes, sir.
23      Q.   Now, as of the May 2, 2002 there
24  was already a stock certificate in existence
25  for 750,000 shares of Xethanol stock in the

```
 1            FRANZ SKRYANZ
 2   name of Thomas A. Thomas as trustee; correct?
 3       A.   Correct.
 4       Q.   The third paragraph of this
 5   letter dated February 11, 2004 says,
 6   "Concurrently with the above, the Julianne C.
 7   Murphy Revocable Trust has decided to
 8   purchase an additional 500,000 shares of
 9   Xethanol."
10            Do you see that, sir?
11       A.   Yes.
12       Q.   Did you view the additional
13   500,000 shares as being beyond the 750,000
14   that were already represented by stock
15   certificate number 40?
16       A.   No, sir.
17       Q.   How do you believe that she was
18   buying an additional 500,000 shares if she
19   already had 750,000 shares?
20       A.   Only 250,000 of those 750,000
21   shares had been paid for at that point. Why
22   she put additional, I do not know. Would
23   have been better if she had said the
24   remaining.
25       Q.   Staying with Exhibit 2, I would
```

```
 1              FRANZ SKRYANZ
 2   like to turn your attention to your memo to
 3   Mr. Taylor dated May 21, 2002, which appears
 4   immediately after Mrs. Murphy's letter of
 5   February 11, 2004.
 6              Do you see that?
 7        A.   Yes, I am looking at it.
 8        Q.   It's a one-page document dated
 9   May 21, 2002.
10        A.   Yes.
11        Q.   Did you prepare that?
12        A.   Yes, I did.
13        Q.   In paragraph five of your memo
14   you say, "Of the above balance, John Murphy
15   (MLP) used $50,000 to purchase 500,000 shares
16   of Xethanol at $0.10 per share"; do you see
17   that?
18        A.   Yes, I do.
19        Q.   Why didn't your memo make any
20   reference to the Julianne C. Murphy Revocable
21   Trust in paragraph five?
22        A.   I do not know.
23        Q.   In fact, the $50,000 did not
24   come from the Julianne Murphy Revocable
25   Trust; did it?
```

```
 1                FRANZ SKRYANZ
 2          MR. ROTELLA:  Objection to the
 3   form.
 4          MR. PALMER:  Objection to the
 5   form.
 6     A.   It came from the loan that MLP
 7   Number One had taken from the First Florida
 8   Bank.
 9     Q.   And that money was deposited
10   into an Xethanol account; was it not?
11     A.   Correct.
12     Q.   On that account Mr. Murphy and
13   you were the authorized signatories; correct?
14     A.   Correct.
15     Q.   To your knowledge, has
16   Mr. Murphy ever been an officer, director or
17   employee of Xethanol?
18     A.   Not that I know of, no.
19     Q.   On what basis would he be
20   authorized to serve as a signatory on a bank
21   account of the company?
22     A.   When the account was opened and
23   with a view to its getting a loan deposited
24   into it, I understood from Mr. Taylor that
25   Mr. Murphy requested to be a signatory to the
```