```
 1                FRANZ SKRYANZ
 2   account.
 3        Q.    But he did not work for the
 4   company; correct?
 5        A.    Correct.
 6        Q.    Had no formal legal relationship
 7   with the company; correct?
 8        A.    Correct.
 9        Q.    Why would you allow this
10   stranger, so to speak, to have signature
11   authority for one of your accounts?
12        A.    I do not know, sir.  That was
13   Mr. Taylor's decision.
14        Q.    To your knowledge, has Xethanol
15   ever had any other strangers that had
16   signature authority to any of their bank
17   accounts?
18             MR. PALMER:  Objection to the
19        form.
20        A.    Not that I know of.
21        Q.    So this was the only occasion
22   that you are aware of in which a non-officer,
23   non-director, non-employee had signature
24   authority over an Xethanol bank account?
25        A.    Yes.
```

```
 1                    FRANZ SKRYANZ
 2        Q.    Staying with Exhibit 2, I just
 3   want to go back to the second page of the
 4   attachments.  It should be a memo from
 5   Mr. Murphy to Chris Taylor dated June 25,
 6   2002.
 7             Do you see that?
 8        A.    Yes, I do.
 9        Q.    Is that your handwritten
10   notation in the middle of the page?
11        A.    Number 40 with an arrow?
12        Q.    Yes, sir.
13        A.    Yes, it is.
14        Q.    What do you understand this memo
15   to mean?
16        A.    That he returned the stock
17   certificate to be re-issued as per the letter
18   that forms the page just before the one we
19   are looking at.
20        Q.    So Mr. Murphy was transmitting
21   to Mr. Taylor the original stock certificate
22   number 40?
23        A.    Yes, sir.
24        Q.    And that stock certificate was
25   in the name of Thomas A. Thomas as trustee;
```

1              FRANZ SKRYANZ

2    correct?

3         A.    Correct.

4         Q.    Did you have any involvement

5    sir, in issuing stock certificate number 40?

6         A.    Yes, I did.

7         Q.    After the stock certificate was

8    issued, what did you do with it?

9         A.    The stock certificate was issued

10   or stock certificates were issued at the time

11   from Mr. Taylor's computer in his apartment

12   and the stock certificate, after it was

13   issued and signed by Mr. Taylor and myself,

14   was left with Mr. Taylor for transmittal to

15   Mr. Murphy.

16        Q.    The stock certificate was in the

17   name of Thomas A. Thomas; correct?

18        A.    Correct.

19        Q.    To your knowledge, did anybody

20   at Xethanol ever send stock certificate

21   number 40 to Thomas A. Thomas?

22        A.    I can only speak for myself.  I

23   did not.  I don't know if Mr. Taylor sent it

24   or if on some occasion handed it to

25   Mr. Murphy.  I do not know.

1               FRANZ SKRYANZ

2      Q.   Looking at the last page of

3 Exhibit 2, that is the schedule of stock

4 certificates; correct?

5      A.   Correct.

6      Q.   Are you following me, sir?

7      A.   Yes, I am.

8      Q.   Can you see stock certificates

9 number 72, 73 and 87?

10     A.   Yes, sir.

11     Q.   Those are in the name of Thomas

12 A. Thomas as trustee, correct?

13     A.   Correct.

14     Q.   Did you issue those stock

15 certificates?

16     A.   Yes, we did.  When I say "we," I

17 mean Mr. Taylor and myself.

18     Q.   Did you send those three stock

19 certificates, 72, 73 and 87, to Mr. Thomas as

20 trustee?

21     A.   No, I did not.  I believe they

22 were also left with Mr. Taylor.

23     Q.   What was your protocol, what was

24 your usual course of conduct with respect to

25 delivering stock certificates to

```
                    FRANZ SKRYANZ
 1

 2   stockholders?

 3        A.    I would say there was no

 4   protocol or procedure, formal procedure,

 5   established.  Most of the original, or let me

 6   say most of the early stock certificates that

 7   were issued to initial investors were left

 8   with Mr. Taylor for delivery to those

 9   investors.

10        Q.    Was it your typical practice to

11   deliver stock certificates to the people

12   whose names appeared on those stock

13   certificates?

14             MR. ROTELLA:  Objection to the

15        form of the question.

16        Q.    You can answer, sir.

17        A.    Yes.

18        Q.    Now, you told me that you have

19   been the vice-president, secretary, treasurer

20   of Xethanol since the date of its formation;

21   correct?

22        A.    Correct.

23        Q.    At any time during your service

24   in those capacities, did you ever have

25   occasion to send anything to Thomas A. Thomas
```

```
 1              FRANZ SKRYANZ
 2   as trustee?
 3        A.    No, I did not.
 4        Q.    Have you ever had an occasion to
 5   receive anything from Thomas A. Thomas as
 6   trustee?
 7        A.    No, I have not.
 8        Q.    In your capacity as secretary of
 9   the company, are you responsible for
10   overseeing the company's books and records?
11        A.    Yes, I am.
12        Q.    Have you ever seen, in any of
13   the company's books and records, any
14   correspondence between Xethanol and Thomas A.
15   Thomas as trustee?
16        A.    No, I believe I have not.
17        Q.    Going back to this memo dated
18   June 25, 2002, Mr. Murphy indicates that he
19   is enclosing the original stock certificate
20   for the 750,000 shares; correct?
21        A.    Correct.
22        Q.    Do you know how Mr. Murphy had
23   possession of the original stock certificate?
24        A.    No, I do not. As I had
25   mentioned earlier, I believe Mr. Taylor had
```

```
 1              FRANZ SKRYANZ
 2    either sent it to him or handed it to him
 3    personally.
 4         Q.    Mr. Murphy?
 5         A.    Yes.
 6         Q.    Let me ask you to turn to the
 7    next page, which is dated August 1, 2003.
 8              Have you ever seen that document
 9    before?
10         A.    Yes, I have.
11         Q.    Can you tell me what you
12    understand it to be, please?  We are still
13    within Exhibit 2, I am referring to a
14    document on the upper-right hand corner, it
15    is number 135 004/005.
16         A.    Yes, I am looking at it.
17         Q.    Have you seen this document
18    before?
19         A.    Yes, I have.
20         Q.    This is a document that you
21    produced in response to a subpoena; correct?
22         A.    Correct.
23         Q.    How is it that you had a copy of
24    this document?
25         A.    Because I received a copy from
```

```
 1                    FRANZ SKRYANZ
 2   Mr. Taylor.
 3        Q.    What do you understand this
 4   document to represent?
 5        A.    I believe this document to
 6   represent the cancellation of stock
 7   certificates number 69 and 70 in the name of
 8   William and Hope Rolls was justified because
 9   no compensation was received for these
10   shares.
11        Q.    For the benefit of the record,
12   we will read the short letter into the
13   record.  It says, "Please be advised that I,
14   John J. Murphy, Junior, received no
15   compensation for the stock issued to the Roll
16   entities and therefore request that all stock
17   be canceled and issued to Mr. Patrick A.
18   Raley, for the benefit of the trust of John
19   J. Murphy, Junior."
20             Correct?
21        A.    Correct.
22        Q.    Did you have any understanding,
23   sir, as to what compensation, if any,
24   Mr. Murphy was supposed to receive for the
25   stock issued to the Rolls entity?
```

```
 1              FRANZ SKRYANZ
 2      A.    No, I do not, sir.
 3      Q.    Is that your handwritten
 4  notation in the middle of this document?
 5      A.    Yes, it is.
 6      Q.    Numbers 69 and 70?
 7      A.    Yes.
 8      Q.    And that represents the two
 9  stock certificates were issued to William and
10  Hope C. Roll Trust, respectfully?
11      A.    Yes.
12      Q.    Did you have any understanding,
13  sir, as to what authority Mr. Murphy had to
14  direct Xethanol to cancel and reissue stock?
15      A.    He originally paid for, not he
16  personally, but he caused payment for those
17  shares.  And it was Mr. Taylor's
18  understanding that Mr. Murphy had the
19  authority to request cancellation of these
20  shares and he instructed me so.
21      Q.    You say he paid or caused to be
22  paid.  Are you referring to Mr. Murphy?
23      A.    Yes.
24      Q.    How much did Mr. Murphy pay or
25  cause to be paid for the 300,000 shares
```

```
 1              FRANZ SKRYANZ
 2   reflected by stock certificates 69 and 70?
 3       A.    $30,000.
 4       Q.    I am sorry, $30,000?
 5       A.    Yes, 300,000 at 10 cents a
 6   share.
 7       Q.    What was the source of the
 8   $30,000?
 9       A.    That I do not know, sir.  It's
10   the $30,000, a part of that page that we had
11   looked for earlier that said payments
12   received by Xethanol Corporation for 750,000
13   shares.
14       Q.    I am sorry, say that again.
15       A.    The $30,000 were part of the
16   payments received by Xethanol Corporation for
17   the 750,000 shares, which was page 10 of
18   Exhibit 9.
19             MR. PALMER:  39.
20       Q.    So you're saying, sir, that of
21   the $75,000 that is reflected on page 10 of
22   Exhibit 39, 30,000 of those dollars were
23   actually earmarked for the purchase of the
24   Rolls stock?
25       A.    No, I did not say that.
```