1       CHRISTOPHER d'ARNAUD-TAYLOR
2  company had an active management services
3  engagement?
4       A.   I believe towards the end,
5  probably the end of the first quarter of this
6  year.
7       Q.   Does the company maintain books
8  and records?
9       A.   Yes.
10      Q.   And where are they maintained?
11      A.   They are maintained in New York.
12      Q.   At what location?
13      A.   My apartment and some at
14 Mr. Skryanz's apartment.
15      Q.   Can you give me some sense of
16 the types of books and records that you
17 maintain of London Manhattan?
18      A.   Mostly fairly basic Quicken
19 accounting records and banking records.  It
20 does have one other current management
21 services agreement.
22      Q.   Okay.
23           And are any of those agreements
24 that you referenced this morning, either the
25 current one or the one that terminated in the

```
 1         CHRISTOPHER d'ARNAUD-TAYLOR
 2   first part of 2006, were they with the
 3   Xethanol Corporation?
 4         A.    The one that terminated earlier
 5   was with the Xethanol Corporation.
 6         Q.    When did that agreement begin?
 7         A.    I believe it began somewhere in
 8   2002, I believe.
 9         Q.    Sir, have you ever met me
10   before?
11         A.    I don't think so.  I don't know
12   so, but I don't think so.
13         Q.    Do you recall ever meeting me
14   before?
15         A.    I don't.
16         Q.    Have you and I ever spoken
17   before?
18         A.    I don't think so.
19         Q.    Have you and I ever exchanged
20   any e-mails or correspondence or any material
21   of any kind?
22         A.    Not to my recollection.
23         Q.    Have you spoken to anybody at
24   Greenberg Traurig relative to your deposition
25   this morning?
```

1    CHRISTOPHER d'ARNAUD-TAYLOR
2    A.    No.
3    Q.    Other than information that may
4    have been provided in response to a subpoena,
5    have you furnished to Greenberg Traurig any
6    information concerning John J. Murphy, Sr.?
7    A.    John J. Murphy, Sr. or Jr.?
8    Q.    Either one.  Let's go with Sr.
9    A.    I don't know.  In the past, yes.
10   Q.    When is the last time you
11   furnished information to Greenberg Traurig
12   regarding John J. Murphy, Sr. or Jr.?
13   A.    I can't remember besides that,
14   but it was when Greenberg Traurig was
15   representing Xethanol.
16   Q.    When did Greenberg Traurig
17   represent Xethanol?
18   A.    Up until late last year.
19   Q.    When did that representation
20   begin?
21   A.    I believe it began somewhere
22   around 2002 or 2003.
23   Q.    What type of representation did
24   Greenberg Traurig provide to Xethanol?
25   A.    They were our corporate general

1       CHRISTOPHER d'ARNAUD-TAYLOR

2  counsel and they provided all of our

3  security.

4       Q.    Has Greenberg Traurig ever

5  represented London Manhattan Limited?

6       A.    I do not believe so.

7       Q.    Look at Exhibit 1. You were

8  asked to provide a corporate representative

9  most knowledgeable of those five subject

10 matters. Do you see that?

11      A.    Yes, I do.

12      Q.    Do you feel that you are the

13 person most knowledgeable of the subject

14 matters?

15      A.    Probably Mr. Skryanz may be more

16 knowledgeable on some of the financial

17 transactions.

18      Q.    You're looking at Exhibit A of

19 Exhibit 1?

20      A.    The document is Exhibit 1 and

21 Exhibit A.

22      Q.    Right.

23      A.    Mr. Skryanz may have more direct

24 knowledge of that.

25      Q.    Which category are you referring

Case 6:04-ap-00154-KSJ    Doc 287-1    Filed 02/06/07    Page 5 of 10

15

```
1        CHRISTOPHER d'ARNAUD-TAYLOR
2   to?
3        A.    Probably 2 and 3 and 4.
4        Q.    2, 3 and 4?
5        A.    Yes.
6        Q.    One more thing.  You have to
7   answer audible.  It's difficult for her to
8   take down nonverbal responses.
9        A.    My apologies.
10       Q.    I want to make sure I understand
11  the circumstances you are telling me.
12             Mr. Skryanz may be more
13  knowledgeable of paragraphs 2, 3 and 4 than
14  you are?
15       A.    Perhaps could be, I am not sure.
16       Q.    What is your basis of believing
17  Mr. Skryanz may have more knowledge of those
18  subject matters than you?
19       A.    Because he handled most banking
20  transactions.
21             THE WITNESS:  May I ask you a
22       question?
23             MR. PALMER:  Sure.  Off the
24       record.
25             (Off the record.)
```

LEGALINK, A MERRILL CORPORATION
(800) 325-3376    www.Legalink.com

CHRISTOPHER d'ARNAUD-TAYLOR

1
2   Q.   We are back on the record, sir.
3   In making the decision that you would appear here today as the corporate representative of London Manhattan Limited, did you speak to Mr. Skryanz about topics 2, 3 and 4 on Exhibit 1?

8   A.   No.

9   Q.   Is there a reason that Mr. Skryanz is not here today to discuss topics 2, 3 and 4 of Exhibit 1?

12   A.   No.

13   Q.   I don't mean to be confrontational in any way, but I came to New York to depose the corporate representative of London Manhattan Limited most knowledgeable of the these five subject matters.

19   A.   I am knowledgeable.

20   Q.   But you think Mr. Skryanz has more knowledge?

22   MR. PALMER:   Objection to the form.

24   A.   He is more intimately involved in handling the accounting transaction.

CHRISTOPHER d'ARNAUD-TAYLOR

Q. Do you feel you are the person most knowledgeable of the subjects 1 and 5 of Exhibit 1?

A. Yes.

Q. I am going to have to reserve the right, depending on how the deposition goes, to potentially come back to depose Mr. Skryanz if it turns out you are not the most knowledgeable person.

Are you aware, sir, that Rivertree Landing subpoenaed documents from London Manhattan Limited?

A. My recollection is that I haven't received such subpoenas, but I am now aware such subpoenas were issued.

Q. Did you have any discussions with Mr. Skryanz or anyone else at London Manhattan Limited regarding those subpoenas?

A. Not material.

Q. What does that mean?

A. It means that Mr. Skryanz was conversing with the attorneys and I wasn't.

Q. I am not asking you what may have been discussed with your counsel. It is

```
 1         CHRISTOPHER d'ARNAUD-TAYLOR
 2   my understanding you are aware that
 3   Mr. Skryanz was communicating with your
 4   counsel regarding the subpoenas.
 5         A.    Yes.
 6         Q.    Did you have any role, sir, in
 7   compiling any documents that were responsive
 8   to the subpoena?
 9         A.    No.
10         Q.    Do you know what, if anything,
11   Mr. Skryanz did to locate documents that were
12   responsive to the subpoena?
13         A.    No.
14         Q.    Did you authorize him to take
15   whatever actions were necessary to respond to
16   the subpoena?
17         A.    I didn't specifically authorize
18   him, no.
19         Q.    Was he authorized to do that on
20   his own accord?
21         A.    I would think so.
22         Q.    As an officer of the company?
23         A.    Yes.
24         Q.    I am going to show you what we
25   have marked as Exhibit 2.
```

1       CHRISTOPHER d'ARNAUD-TAYLOR
2              Have you ever seen this document
3    before, sir?
4              (Document marked for
5         identification, Exhibit 2.)
6       Q.   Sir, have you ever seen
7    Exhibit 2 before?
8       A.   I do not believe so.
9       Q.   Did you at any time discuss with
10   Mr. Skryanz Exhibit 2 or the documents
11   attached to it?
12      A.   Not to the best of my knowledge.
13      Q.   Sir, do you know John J. Murphy?
14      A.   Yes, I do.
15      Q.   Who do you know or understand
16   him to be?
17      A.   I don't understand your
18   question.
19           MR. PALMER:  Objection to the
20        form.
21      Q.   The John J. Murphy that you
22   know, where does he liver?
23      A.   Presently, I believe he lives in
24   Savannah, Georgia.
25      Q.   When did you first meet

CHRISTOPHER d'ARNAUD-TAYLOR

```
 1                CHRISTOPHER d'ARNAUD-TAYLOR
 2   Mr. Murphy?
 3        A.   I believe I first met Mr. Murphy
 4   in late 2001.
 5        Q.   2001?
 6        A.   Yes.
 7        Q.   What were the circumstances
 8   under which you met Mr. Murphy?
 9        A.   A mutual acquaintance of
10   somebody who worked for Mr. Murphy, a
11   gentleman called Jacques Duval, brought our
12   attention to a business plan that had been
13   prepared by Mr. Murphy and Mr. Duval and a
14   team called Very Smart Buildings.
15             And we thought at the time that
16   it was an interesting prospective financing
17   situation.  So we went to Orlando, to Winter
18   Park, and we met with Mr. Duval.  And later
19   that day we met with Mr. Murphy, but not
20   substantively at that time.
21        Q.   During that approximate time
22   frame, late 2001, where did you understand
23   Mr. Murphy to reside?
24        A.   I believe he resided in Winter
25   Park.
```