1    CHRISTOPHER d'ARNAUD-TAYLOR

2        Q.    Has Mr. Murphy ever been an

3    officer of London Manhattan Limited?

4        A.    No formal officership was ever

5    given to him.  But at one point in time he

6    was expected to become an officer.

7        Q.    Do you know whether he ever held

8    any position within London Manhattan either

9    as shareholder, employee, manager?

10       A.    He has definitely not been a

11   shareholder.  And as I said, there was

12   intended at one point in time that he would

13   become a shareholder and would become an

14   officer, but that never happened.

15       Q.    Was there a reason that never

16   materialized?

17       A.    Let me try and remember.  No

18   specific reason, just that the original

19   purpose behind the activity, times changed.

20       Q.    What was the subject matter that

21   prompted the intention for him to become

22   associated with London Manhattan Limited?

23       A.    We were -- it was going to be to

24   try and raise capital.

25       Q.    For what?

1       CHRISTOPHER d'ARNAUD-TAYLOR

2           A.      To invest money into Xethanol at

3       that time, or Xethanol's predecessor.

4           Q.      And I understand you to say

5       that did not happen?

6           A.      Right.

7           Q.      Why didn't that happen?

8           A.      Because the source of the

9       capital was not real.

10          Q.      What did you mean by that, "not

11      real"?

12          A.      It was a leverage lending

13      program and it just couldn't happen.

14          Q.      Sir, let me show you something

15      that we will mark as Exhibit 3.

16              I want to call your attention to

17      the second page of it.  It's denominated

18      "Articles of Amendment to Articles of

19      Incorporation, London Manhattan Limited,

20      Inc."

21              Have you ever seen that before?

22          A.      No, I haven't.

23              (Articles of incorporation

24          marked for identification, Exhibit 3.)

25          Q.      Were you associated with London

1    CHRISTOPHER d'ARNAUD-TAYLOR

2  Manhattan Limited in April of 2002?

3       A.    I was.

4       Q.    What was your position at that

5  time?

6       A.    I can't quite recall, but I

7  don't believe it was anything.

8       Q.    Was Scott Smith the president of

9  the company in 2002?

10      A.    He was.

11      Q.    How would you characterize your

12 association with the company in 2002?

13      A.    Prospective officer, prospective

14 shareholder.

15      Q.    Were you aware that John Murphy

16 at one point was a director of London

17 Manhattan?

18      A.    I was not aware of that, no.

19      Q.    Now that you see Exhibit 3, do

20 you have any reason to doubt that that

21 occurred?

22      A.    It seems clear.

23      Q.    Do you know what Mr. Murphy's

24 duties and responsibilities were as a

25 director of London Manhattan Limited?

CHRISTOPHER d'ARNAUD-TAYLOR

1

2    A.    No.

3    Q.    Do you know how long Mr. Murphy

4 remained with London Manhattan as a director?

5    A.    No.

6    Q.    To the extent that Mr. Murphy at

7 some point discontinued being a director, do

8 you know why that occurred?

9    A.    My recollection is that this

10 particular process was designed with a

11 specific set of projects in mind and those

12 projects did not -- were not pursued.

13    Q.    Am I understanding you to say

14 that Mr. Murphy became a director for the

15 limited purpose of pursuing certain

16 initiatives that for whatever reason did not

17 materialize?

18    A.    That would be an accurate

19 description.

20    Q.    Am I also understanding you to

21 say that after those initiatives did not

22 materialize, it was no longer necessary or

23 desired for Mr. Murphy to be a director?

24    A.    That would be accurate.

25    Q.    Has London Manhattan ever had

CHRISTOPHER d'ARNAUD-TAYLOR

any legal disputes with Mr. Murphy?

    A.    Not to my recollection.

    Q.    Has London Manhattan Limited ever alleged Mr. Murphy did or did not do something that he should or should not have done?

           MR. PALMER:  Objection to the form.

    A.    Not to my recollection.

    Q.    To your knowledge, has Xethanol ever had any legal disputes with Mr. Murphy?

    A.    Could I ask you to define what you mean by "legal disputes"?

    Q.    Any controversy from any action or interaction of Mr. Murphy.

           MR. PALMER:  Objection to the form.

           MR. ROTELLA:  I also object to the form.  I think it is a confusing question.  You may want to clarify what you mean by "legal."

    Q.    Do you understand the question?

    A.    The question is do we have -- does Xethanol have any legal controversy with

CHRISTOPHER d'ARNAUD-TAYLOR

Mr. Murphy?

Q.    Have you ever had a legal controversy with Mr. Murphy?

A.    With Mr. Murphy or an entity in which Mr. Murphy was involved?  I don't understand your question.

Q.    Have you ever had any legal controversy with Mr. Murphy in which you contended that he did or did not do something that he should or should not have done?

MR. PALMER:  Objection to the

form.

When you say "you," are you

saying Xethanol?

MR. ROTELLA:  I have a problem

with the word "legal" controversy.

A.    To the extent I understand what you're asking, I do not believe so.

Q.    Has Xethanol ever had a legal controversy in which Mr. Murphy was somehow involved?

A.    Yes.

Q.    Can you explain the circumstances to me?

1    CHRISTOPHER d'ARNAUD-TAYLOR

2        A.    There is a legal dispute between

3    us and -- between Xethanol, sorry, and

4    certain former partners of Mr. Murphy's,

5    namely the Rolls.

6        Q.    Is that dispute currently in

7    litigation?

8        A.    It is.

9            MR. ROTELLA:  Excuse me.  If he

10           is going to be the corporate

11           representative for Xethanol and you

12           want to combine these two depositions,

13           so we don't get any questions that

14           have to do with London Manhattan

15           Limited, I don't have an objection to

16           that.

17           MR. SPIVEY:  I want to do them

18           separately.  I will get to that, but I

19           appreciate the overture.

20       Q.    Sir, let me show you something

21    we will mark as Exhibit 4.

22           Have you ever seen this before,

23    sir?

24           (Document marked for

25           identification Exhibit 4.)

1        CHRISTOPHER d'ARNAUD-TAYLOR

2        A.    Nope.

3        Q.    It purports to be a document

4   filed with the Florida Secretary of State on

5   April 28, 2003.

6             Do you recognize the signature

7   at the bottom of the document?

8        A.    I do.

9        Q.    What signature do you recognize

10  that to be?

11       A.    Franz Skryanz.

12       Q.    Does this reflect, sir, your

13  addition to London Manhattan as a president,

14  director.

15            Do you see in the lower

16  right-hand corner?

17       A.    Yes, I see additional.

18       Q.    Do you see your name?

19       A.    Yes.

20       Q.    Do you see the address 360 West

21  22nd Street, 16-B?

22       A.    Yes.

23       Q.    What address is that, sir?

24       A.    That is my address.

25       Q.    Your residential address?

CHRISTOPHER d'ARNAUD-TAYLOR

1

2      A.      Yes, it is.

3      Q.      And is this consistent with your

4  recollection as to when you became

5  technically affiliated with London Manhattan

6  Limited?

7      A.      It would appear so.

8      Q.      Mr. Skryanz appears to be added

9  to the company at the same time as a

10  treasurer-secretary, director; is that

11  correct?

12      A.      It would appear so.

13      Q.      Did you become a shareholder in

14  the company contemporaneously or at the time

15  of the addition?

16      A.      I have no direct recollection of

17  the date I became a shareholder, but I

18  suspect it would be around about that.

19      Q.      As you sit here today, you are

20  the sole shareholder of the company; correct?

21      A.      I am the sole shareholder.

22      Q.      Was there ever a time there was

23  more than one shareholder?

24      A.      It was expected to be more than

25  one shareholder, which was Mr. Smith, but he

1       CHRISTOPHER d'ARNAUD-TAYLOR

2   never became a shareholder.

3       Q.    Is it fair to say you were a

4   shareholder before you became an officer and

5   director?

6       A.    I cannot recall.

7       Q.    Has there ever been any other

8   shareholder other than you in London

9   Manhattan?

10      A.    I do not believe so.

11      Q.    Exhibit 4 also reflects

12  Mr. Murphy's delineation as a director.

13            Do you see that?

14      A.    I do.

15      Q.    Do you have any reason to

16  disagree that he was deleted as a director on

17  or about April 24, 2003?

18      A.    I have no reason to.

19      Q.    Can you give me any more

20  specific reason as to why Mr. Murphy was

21  deleted from the company?

22      A.    I believe I answered that

23  earlier on.  His original involvement in the

24  company was for a specific set of

25  initiatives, which you put very eloquently.