CHRISTOPHER d'ARNAUD-TAYLOR

1
2  And when they didn't come to pass, it didn't
3  seem appropriate to have Mr. Murphy involved
4  in the company.
5       Q.    To your knowledge, did
6  Mr. Murphy ever have any signature authority
7  over any bank accounts of London Manhattan?
8       A.    I do not believe so.
9       Q.    To your knowledge, did he ever
10 have the authority to bind the company into
11 any undertakings?
12            MR. ROTELLA:  Objection to the
13      form of the question.
14      Q.    You could answer.
15      A.    I do not believe so.
16      Q.    When is the last time you spoke
17 to Mr. Murphy?
18            MR. PALMER:  Objection to the
19      form.  Do you mean you personally or
20      you, on behalf London Manhattan
21      Limited?
22      Q.    Personally?
23      A.    Personally?
24      Q.    Yes.
25      A.    I spoke to him yesterday, sir.

1  CHRISTOPHER d'ARNAUD-TAYLOR
2  Q. What was the occasion on which
3  you spoke to him yesterday?
4  A. To inquire into a business
5  matter relative to Xethanol Corporation.
6  Q. How long did you speak to
7  Mr. Murphy yesterday, sir?
8  A. Probably 20 minutes.
9  Q. And where was he at the time of
10 the phone conversation?
11 A. I believe he was driving.
12 Q. Do you know where he was,
13 Florida, Georgia?
14 A. I believe he was in Georgia.
15 Q. Did you discuss your deposition
16 today?
17 A. Nope.
18 Q. Did you discuss his deposition
19 on Wednesday of this week?
20 A. No.
21 Q. Did you discuss the pending
22 Xethanol litigation in the Middle District of
23 Florida?
24 A. No.
25 Q. Did you discuss Mr. Murphy's

CHRISTOPHER d'ARNAUD-TAYLOR

1
2    pending bankruptcy action in the Bankruptcy
3    Court in the Middle District of Florida?
4        A.    Nope.
5        Q.    Does Mr. Murphy currently have
6    any affiliation with Xethanol?
7            MR. ROTELLA: Objection to the
8        form of the question.
9        A.    Indirectly, yes.
10       Q.    What kind of indirect
11   affiliation do you believe him to have?
12       A.    I believe Mr. Murphy's company,
13   Epiphany, which I believe to be his company,
14   is a consultant to a company called Coastal
15   Energy Development, which is a management
16   service company and shareholder in Coastal
17   Xethanol, which is a limited liability
18   company operating in the southeast.
19       Q.    The Epiphany entity that you
20   referenced, do you know the full name of it,
21   sir?
22       A.    I believe it to be Epiphany
23   Partners, but I don't know the full name.
24       Q.    Do you know what Mr. Murphy's
25   affiliation is with Epiphany Partners?

CHRISTOPHER d'ARNAUD-TAYLOR

A. No, I do not.

Q. Other than this indirect affiliation that you just described, do you recognize Mr. Murphy as having any other affiliation with Xethanol?

A. I believe that to be the sole basis for his affiliation with Xethanol.

Q. Let's return to Exhibit 2, if I can.

And let's take a look at some of the documents that are attached to Exhibit 2. You will see there are six typewritten pages followed by the attachment of some records; do you see that?

A. I do.

Q. And the first one appears to be a transmittal memo from Mr. Murphy to you dated May 22, 2002.

Do you see that?

A. I do.

Q. It says, "Enclosed please find a copy of the stock certificate for 750,000 shares of Xethanol Corporation stock issued to Thomas A. Thomas, issued as trustee for

CHRISTOPHER d'ARNAUD-TAYLOR

the Julian C. Murphy Trust."

     Do you have any knowledge, sir, of the issuance of 750,000 shares to Thomas A. Thomas as trustee?

    A.   I believe they were issued to Thomas A. Thomas.

    Q.   Do you know when that occurred?

    A.   I can't be specific on it, but I believe it was on the -- in the end of 2001. Last quarter of 2001, to the best of my recollection.

    Q.   Let me call your attention to the last page of Exhibit 2, which appears to be a schedule of certain stock certificates.

     Have you ever seen that document before?

    A.   I may not have seen this particular document, but it is a printout.

    Q.   A printout of what?

    A.   I think of the stock ledger.

    Q.   Of Xethanol Corporation?

    A.   It would appear so.

    Q.   According to the first line of this document, it says "That certificate

1      CHRISTOPHER d'ARNAUD-TAYLOR
2  number 40 was issued to Thomas A. Thomas as
3  trustee on December 1, 2001 in the amount of
4  750,000 shares."
5          Do you see that?
6     A.   I do.
7     Q.   Is that consistent with your
8  recollection of when 750,000 shares were
9  issued to Thomas A. Thomas as trustee?
10    A.   It does.
11    Q.   Do you know whether any
12 consideration was paid to Xethanol
13 Corporation for the issuance of those 750,000
14 shares?
15    A.   It was paid in the, I believe to
16 the best of my recollection, in the first
17 quarter of 2002. And I believe some of it
18 was in May 2002.
19    Q.   What prompts your recollection
20 of that or those payments?
21    A.   Having reviewed similar
22 documents recently in the other matter.
23    Q.   You are referring to the Roll
24 litigation?
25    A.   Yes, sir.

CHRISTOPHER d'ARNAUD-TAYLOR

Q. Have you ever deposed in the Roll litigation?

A. I have.

Q. When did that take place?

A. Maybe three weeks ago.

Q. Was that here in New York?

A. In New York.

Q. What amount of consideration was paid to Xethanol Corporation for the issuance of those 750,000 shares?

A. I can't recall the precise cash consideration.

Q. Can you give me any ballpark estimate of what it was?

MR. PALMER: Objection to the form.

A. It's a matter of fact. I can't answer it specifically because it was way, way, way back long time. But I don't think it was more than $50,000.

Q. $50,000?

A. I don't think it was more than that.

Q. What documents would confirm or

1       CHRISTOPHER d'ARNAUD-TAYLOR
2   reflect the actual amount of consideration
3   that was paid for those shares?
4       A.   The records in the accounting.
5       Q.   Do you know who paid the cash
6   consideration in approximately May of 2002
7   for the issuance of those 750,000 shares?
8       A.   I don't personally know
9   directly, no.
10      Q.   Have you heard from any source
11  other than your counsel who paid it?
12      A.   I don't quite understand the
13  question.
14      Q.   Some amount of money was paid to
15  Xethanol Corporation for the issuance of
16  750,000 shares; correct?
17      A.   Correct.
18      Q.   My question is, who paid you the
19  money, "you" being Xethanol?
20      A.   My answer is I don't know.
21      Q.   Your original answer I believe
22  was that you don't have any direct knowledge
23  of that; correct?
24      A.   I don't have any direct
25  knowledge of that, no.

CHRISTOPHER d'ARNAUD-TAYLOR

Q. Do you have any indirect knowledge of that; has somebody told you who paid the money to Xethanol to induce the issuance of the 750,000 shares?

A. No. That would be a matter of record.

Q. What records would I ask for that would reflect that?

A. I think you would ask for Mr. Skryanz to answer that question.

Q. Would you expect there to be banking records that would reflect that?

A. I know there would be banking records reflecting the receipt of the money, which would be the only records we would have or Xethanol would have.

Q. Would you have some notation of the source of that money?

A. I believe you would know where the source, where the money came from, which bank it came from, yes.

Q. Is there a reason that the shares were issued prior to payment for them?

A. No specific reason. We were

CHRISTOPHER d'ARNAUD-TAYLOR

going through a process of reorganization at the time.

Q. Have you ever met Thomas A. Thomas?

A. I believe I have.

Q. Did you ever speak to him in his capacity of trustee of the Julian Murphy Trust?

A. Can you rephrase the question?

Q. Yes. You say that you think you may have spoken to Mr. Thomas; correct?

A. Yes, I believe I have.

Q. In what context were you talking to him?

A. I believed, if I remember rightly and it was a long time ago, that he was introduced to me as an accounting entity.

Q. And who introduced you to him?

A. John Murphy.

Q. Are you aware that at one time Mr. Thomas was a trustee of the Julian Murphy Trust?

A. I was aware that he was a trustee of various aspects of the Murphy