|    |    |
|----|----|
| 1  | CHRISTOPHER d'ARNAUD-TAYLOR |
| 2  | family. |
| 3  | Q.    Were you aware that he was a |
| 4  | trustee of other Murphy-related trusts? |
| 5  | A.    I was aware that he was involved |
| 6  | with the Murphy family and their various |
| 7  | trusts, yes. |
| 8  | Q.    Were you specifically aware that |
| 9  | he was a trustee of multiple Murphy family |
| 10 | trusts? |
| 11 | A.    I was not aware of the multiple |
| 12 | Murphy family trusts.  I was aware he was a |
| 13 | trustee of the Murphy family trust. |
| 14 | Q.    As you sit here today, are you |
| 15 | aware that the Murphy family has multiple |
| 16 | family trusts? |
| 17 | A.    Not specifically. |
| 18 | Q.    The transmittal letter of |
| 19 | May 22, 2002, did you act upon it in response |
| 20 | to receiving that document? |
| 21 | A.    Yes. |
| 22 | Q.    What did you do? |
| 23 | A.    I gave it to Mr. Skryanz to |
| 24 | effectuate the changes. |
| 25 | Q.    What authority did you |

1       CHRISTOPHER d'ARNAUD-TAYLOR
2  understand Mr. Murphy to have to direct you
3  to take actions relative to stock that was
4  titled in the name of Thomas A. Thomas as
5  trustee?
6           MR. ROTELLA:  Objection to the
7       form of the question.
8       Q.   You can answer, sir.
9       A.   I have no specific knowledge of
10  his authorization.
11      Q.   Did you believe he was
12  authorized to direct you to do things
13  relative to the Julian C. Murphy Trust?
14      A.   Clearly I did.
15      Q.   And what was the basis for you
16  recognizing that authority?
17      A.   Because there was a trust for
18  his wife and I assume his wife gave him the
19  instruction or Thomas A. Thomas, since he was
20  the appointed interaction with me.
21      Q.   In response to you receiving
22  this directive from Mr. Murphy on May 22,
23  2002, did you communicate with Thomas A.
24  Thomas as trustee, to see if this was okay to
25  do?

| | |
|---|---|
| 1 | CHRISTOPHER d'ARNAUD-TAYLOR |
| 2 | A.    I personalty did not. |
| 3 | Q.    To your knowledge, did anyone in |
| 4 | the Xethanol entity do that? |
| 5 | A.    Not to my knowledge. |
| 6 | Q.    Now, this memo dated May 22nd is |
| 7 | directed to you and under your name there |
| 8 | appears the name London Manhattan. |
| 9 | Do you see that? |
| 10 | A.    I do. |
| 11 | Q.    Do you have any understanding |
| 12 | why a memo concerning Xethanol Corporation |
| 13 | would be sent to you with a reference to your |
| 14 | entity London Manhattan Limited? |
| 15 | MR. PALMER:  Objection to the |
| 16 | form. |
| 17 | A.    The memo comes from Very Smart |
| 18 | Networks, Inc., and London Manhattan was |
| 19 | involved in trying to find Very Smart |
| 20 | Networks.  If he was sending it from Very |
| 21 | Smart Networks, he would send it to me at |
| 22 | London Manhattan. |
| 23 | Q.    Did London Manhattan in May of |
| 24 | 2002 have any kind of contractual or |
| 25 | consulting arrangement with Xethanol? |

CHRISTOPHER d'ARNAUD-TAYLOR

2  A.   It did.

3  Q.   What was the nature of that
4  contractual or consulting arrangement?

5  A.   Management services.

6  Q.   What would be included in the
7  umbrella of management services?

8  A.   My services.

9  Q.   Did London Manhattan have any
10 responsibility for managing or directing the
11 stock register of Xethanol in 2002?

12 A.   No.

13 Q.   You see some handwritten
14 notations on this memo dated May 22, 2002;
15 correct?

16 A.   Yes.

17 Q.   Do you recognize whose
18 handwriting that is?

19 A.   I do.

20 Q.   Whose handwriting is it?

21 A.   Franz Skryanz.

22 Q.   Do you know when Mr. Skryanz put
23 those markings on the document?

24 A.   Not exactly, no.

25 Q.   What do you understand those

Case 6:04-ap-00154-KSJ    Doc 287-4    Filed 02/06/07    Page 5 of 10

45

```
1        CHRISTOPHER d'ARNAUD-TAYLOR
2   marketings to reflect?
3        A.    To reflect the numbers of the
4   various stock certificates, first of all, the
5   certificate that was 750,000, and secondly
6   the certificates that were reissued.
7        Q.    Am I understanding that to mean
8   the original stock certificate of 750,000
9   shares was broken up into five subsequent
10  stock certificates?
11       A.    That would appear to be the
12  case.
13       Q.    So the original stock
14  certificate number 40 was, in response to
15  this memorandum, broken down into stock
16  certificates 69, 70, 71, 72 and 73; is that
17  correct?
18       A.    Correct.
19       Q.    After these reissuances
20  occurred, Thomas A. Thomas as trustee was
21  left with 400,000 shares; is that correct?
22       A.    It would appear so.
23       Q.    Did you have any understanding
24  as to whether any consideration was paid to
25  Thomas A. Thomas or to anybody in the Murphy
```

LEGALINK, A MERRILL CORPORATION
(800) 325-3376    www.Legalink.com

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2   family for the 350,000 shares that are
 3   reflected in subparts A, B and C of this
 4   memo?
 5        A.   Nope.
 6        Q.   When you say that, you say you
 7   don't know?
 8        A.   I don't know.
 9        Q.   Did you ever talk to Mr. Murphy
10   at any time about why this was being done?
11        A.   I don't have any recollection of
12   that.
13        Q.   You see under the reference to
14   400,000 shares to Thomas A. Thomas, it
15   appears that those shares were reissued in
16   two separate stock certificates; correct?
17        A.   Correct.
18        Q.   Do you have any explanation as
19   to why they were issued in separate
20   certificates as opposed to one lump
21   certificate for 400,000 shares?
22        A.   I have no idea.
23        Q.   Do you know Kenneth Murphy?
24        A.   I believe so.
25        Q.   And how do you know Kenneth
```

```
1           CHRISTOPHER d'ARNAUD-TAYLOR
2    Murphy?
3         A.    I met him in Orlando.
4         Q.    In what capacity?
5         A.    He drove me to the airport.
6         Q.    Who do you understand him to be,
7    is he a relative of John Murphy?
8         A.    Yes.
9         Q.    Other than driving you to the
10   airport, did you ever have any interactions
11   with him?
12        A.    Not really.
13        Q.    How did it come about that
14   Kenneth Murphy drove you to the airport?
15        A.    I was visiting Orlando and he
16   drove me to the airport.
17        Q.    Does he drive a taxi?
18        A.    No.
19        Q.    How did it come about that
20   Kenneth Murphy drove you to the airport?
21        A.    Quite often many people drove me
22   to the airport.
23        Q.    Prior to him driving you to the
24   airport, did you know Kenneth Murphy?
25        A.    I shook his hand as I passed him
```

1    CHRISTOPHER d'ARNAUD-TAYLOR
2    in the hallway.
3        Q.   Do you know him as a relative of
4    John Murphy?
5        A.   I do.
6        Q.   Did you ever speak to Kenneth
7    Murphy in the presence of John Murphy?
8        A.   I may have.
9        Q.   Let's look at the next page of
10   Exhibit 2, which appears to be a transmittal
11   memo dated June 25, 2002 from Mr. Murphy to
12   you; correct?
13       A.   Correct.
14       Q.   What do you understand this memo
15   to mean or convey to you?
16            MR. PALMER:  You can take your
17       time and read it before you answer.
18       A.   I would say transmittal letter
19   returning the stock certificate.
20       Q.   Which stock certificate?
21       A.   The stock certificate number 40.
22       Q.   Was, in fact, the original stock
23   certificate enclosed with this memo?
24       A.   I have no recollection, but I
25   believe so.

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2     Q.   When the stock certificate
 3  number 40 was originally issued, do you know
 4  to whom it was delivered?
 5     A.   All deliveries would have been
 6  made by Mr. Skryanz.
 7     Q.   Do you know who that specific
 8  stock certificate was issued to, delivered
 9     A.   Stock certificate issued or
10  stock certificate delivered?
11     Q.   Delivered.
12     A.   I have no specific recollection.
13  My assumption, it would be sent to
14  Mr. Murphy.
15     Q.   Why would you assume it would be
16  sent to Mr. Murphy?
17     A.   Mr. Murphy was our interface.
18     Q.   To the extent it was transferred
19  by mail, UPS, or any other mode of delivery
20  along those lines, would there be any
21  transmittal correspondence?
22     A.   I doubt it.  It would have been
23  sent in regular mail.
24     Q.   Just in a regular envelope?
25     A.   Yes.
```

CHRISTOPHER d'ARNAUD-TAYLOR

Q. No cover letter?

A. Very rarely.

Q. Do you know why it would not have been sent to Thomas A. Thomas as trustee?

A. I don't know. It very well could have been.

Q. But you assume it was sent to Mr. Murphy?

A. I assume.

Q. Do you know how Mr. Murphy had possession of stock certificate 40 such that he could return it to you on June 25, 2002?

A. No.

Q. Do you have any understanding of Mr. Murphy's affiliation with the Julian C. Murphy Trust?

A. No.

Q. Do you recognize him to have any authority to conduct affairs relative to the Julian C. Murphy Trust?

A. Not specifically.

Q. Have you ever recognized his authority to do that?