```
 1          CHRISTOPHER d'ARNAUD-TAYLOR
 2          Q.    Let's go to the next document
 3    sir, which appears to be a letter from Julian
 4    C. Murphy to Mr. Skryanz dated February 11,
 5    2004.
 6                Have you ever seen this document
 7    before?
 8          A.    Yes.
 9          Q.    What do you understand this
10    letter to be?
11                MR. PALMER:  I am going to
12          object to the form.  You're getting
13          back to the same situation, there is
14          nothing on here regarding London
15          Manhattan.  And that is what he is
16          sworn in on right now.  I am concerned
17          that we are going to double-track on
18          that again.
19          A.    I am sorry, can you repeat the
20    question?
21          Q.    Yes.
22                Have you ever seen this document
23    before?
24          A.    Yes, I have.
25          Q.    What do you understand it to be?
```

CHRISTOPHER d'ARNAUD-TAYLOR

1
2    A.    I understand it to be some form of statement by Julian C. Murphy as to a transaction that took place.

5    Q.    Are you familiar with the transaction that took place?

7    A.    I'm aware of the transaction, "familiar" would be too strong a term.

9    Q.    Tell me what you are aware of with respect to the transaction that is described in this letter of February 11, 2004.

13   A.    That there was a transaction in which money was deposited into an Xethanol account at First Florida Bank and part of that was for Xethanol's benefit and part of it was for the benefit of the people who put the money in.

19   Q.    Let me stop you and break that down a little bit.

     To your knowledge, has Xethanol ever had bank accounts at First Florida Bank?

23   A.    Yes, it did.

24   Q.    At what branch of First Florida Bank did Xethanol have accounts?

|     | CHRISTOPHER d'ARNAUD-TAYLOR |
| --- | --- |
| 1   |     |
| 2   | A.  I couldn't tell you. |
| 3   | Q.  Who opened that account or |
| 4   | accounts? |
| 5   | A.  Ultimately it would have had to |
| 6   | be Mr. Skryanz, who had to be a signature on |
| 7   | it. |
| 8   | Q.  Does Xethanol Corporation have |
| 9   | any offices or facilities in the State of |
| 10  | Florida? |
| 11  | A.  No. |
| 12  | Q.  Is there a reason that a banking |
| 13  | account was opened in Florida for Xethanol |
| 14  | Corporation? |
| 15  | A.  To receive funds I believe. |
| 16  | Q.  To receive funds from whom? |
| 17  | A.  We were looking to borrow money |
| 18  | from the Murphys. |
| 19  | Q.  Did you request the Murphys to |
| 20  | loan you money? |
| 21  | A.  Yes. |
| 22  | Q.  And how did you do that, |
| 23  | verbally or by correspondence or -- |
| 24  | MR. PALMER:  Objection to the |
| 25  | form.  Do you mean Xethanol? |

|   |   |
|---|---|
| 1 | CHRISTOPHER d'ARNAUD-TAYLOR |

```
 1              CHRISTOPHER d'ARNAUD-TAYLOR
 2              MR. SPIVEY:  Yes.
 3         A.   I believe it was verbal.
 4         Q.   Is there a reason that Xethanol
 5    asked the Murphys to loan the company money?
 6         A.   I believe, if I remember
 7    rightly, it was a long time ago, that the
 8    Murphys offered the money.
 9         Q.   And if I am understanding you
10    correctly, Xethanol then opened an account at
11    First Florida Bank to receive loan proceeds
12    that would be made available by the Murphys?
13         A.   I believe that was the intent.
14         Q.   To your knowledge, did any of
15    the Murphys have signatory authority over the
16    Xethanol account that was opened in Florida?
17         A.   To the best of my knowledge, I
18    think that John Murphy did.
19         Q.   Was Mr. Murphy an officer,
20    director or employee of Xethanol at that
21    time?
22         A.   No.
23         Q.   Has Mr. Murphy ever been an
24    officer, director or employee of Xethanol?
25              MR. ROTELLA:  You know what
```

CHRISTOPHER d'ARNAUD-TAYLOR

1  counsel was saying a moment ago, I
2  don't want to sit here and go through
3  all of this when Xethanol starts
4  again. Are you going to repeat these
5  questions when we start Xethanol?
6
7      Do we have a stipulation here
8  when he answers an Xethanol question,
9  we are not going to cover it again?
10     MR. SPIVEY:  Yes.
11     A.  Can you repeat the question?
12     Q.  Has Mr. Murphy ever been an
13 officer, director or employee of Xethanol?
14     A.  No.
15     Q.  On what basis would Mr. Murphy
16 have signature authority over a banking
17 account of Xethanol?
18     A.  Because -- I have no explanation
19 of it directly.
20     Q.  How about indirectly?
21     MR. PALMER:  Objection to the
22  form.
23     A.  It was irregular.
24     Q.  How did that happen, how did it
25 come about that Mr. Murphy had signature

CHRISTOPHER d'ARNAUD-TAYLOR

authority of an Xethanol account?

 A. Because I believe he opened the account with the name Xethanol, with Xethanol's approval. And because he was the local signatory, he put his name on the signatory.

 Q. Do you know what is involved in opening a corporate account in a bank?

 A. In Florida?

 Q. Anywhere?

 A. No -- yes, I do, but I don't know what happened in Florida. My understanding at that point in time was it was a particular bank in which he was doing a lot of banking.

 Q. Did Xethanol ever issue any corporate resolutions that authorized Mr. Murphy to open this account at First Florida Bank?

 A. I have no recollection of that. I do doubt it.

 Q. Do you know if Mr. Murphy held himself out at First Florida Bank as being an authorized representative of Xethanol?

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2      A.    I don't know.
 3      Q.    Was, in fact, Mr. Murphy an
 4  authorized representative of Xethanol in
 5  approximately May of 2002?
 6      A.    Nope.
 7      Q.    Have you ever heard of the
 8  entity MLP Number One, Ltd.?
 9      A.    The only time I ever heard of it
10  was in this particular context.
11      Q.    In the context of this letter
12  dated February 11, 2004?
13      A.    Yes.
14      Q.    As you sit here today and having
15  the benefit of this letter in front of you,
16  what do you understand MLP Number One Ltd. to
17  be?
18      A.    I have no idea.
19      Q.    Do you understand it to be an
20  entity of which Mr. or Mrs. Murphy may have
21  some involvement?
22      A.    It would appear so.
23      Q.    Were there ever any proposed or
24  actual loan documents created between the
25  Murphys and any of their entities and
```

CHRISTOPHER d'ARNAUD-TAYLOR

Xethanol Corporation relative to the loan that you referenced a minute ago in your testimony?

A. No, I don't believe there were.

Q. To the extent that Xethanol was, in fact, going to borrow money from the Murphys, would that have been done pursuant to written documentation?

A. It should have been.

Q. Would you have expected it to have been?

A. I would have expected it, yes.

Q. In the second paragraph of this letter dated February 11, 2004, it says that Xethanol then decided that it then did not need the loan.

Do you see that?

A. I do.

Q. Is that consistent with your recollection of the facts?

A. I don't have any specific recollection of the facts. My recollection is it was not ultimately loaned.

Q. You told me previously that

CHRISTOPHER d'ARNAUD-TAYLOR

Xethanol had requested the Murphys to make a loan; is that correct?

    A.    Originally, yes.

    Q.    At some point did Xethanol tell the Murphys, we, Xethanol, no longer want a loan from you?

    A.    I can't say the exact timing, but this was a long cycle process. It wasn't that they were aware that we wanted to borrow money.

    Q.    But my question was, did you ever after initially telling the Murphys that you wanted a loan, did you ever retreat from that directive?

        MR. PALMER: Objection to the form.

    A.    My recollection is that it was not anything specifically retreating from it or not retreating from it. It was a morphing situation.

    Q.    At some point did you become aware that the Murphys or one of their related entities had caused approximately $175,000 to be deposited into an Xethanol

```
1          CHRISTOPHER d'ARNAUD-TAYLOR
2    account at First Florida Bank?
3         A.    I did.
4         Q.    When did you first become aware
5    of it?
6         A.    I can't give you the fact, exact
7    date.
8         Q.    Looking at this letter can
9    you --
10        A.    I can't give you an exact date.
11        Q.    I am asking for an approximate
12   date.
13        A.    Clearly it was around this time.
14        Q.    2004?
15        A.    No, a lot earlier than that.
16        Q.    The first paragraph of this
17   letter, $173,575 was deposited on May 2, 2002
18   to the account of the Xethanol Corporation.
19              Do you see that?
20        A.    Yes, it would be around that
21        Q.    What was your reaction to
22   learning that approximately $175,000 had
23   shown up in an Xethanol account?
24        A.    I went ballistic.
25        Q.    Why did you go ballistic?
```