CHRISTOPHER d'ARNAUD-TAYLOR

2   A.   For the very reasons we discussed earlier, it was highly irregular.

4   Q.   What did you do upon discovering this deposit of almost $175,000 into an Xethanol account?

7   A.   I instructed Mr. Skryanz to regularize the situation.

9   Q.   And did he do that?

10   A.   I believe he did.

11   Q.   To your knowledge, what did Mr. Skryanz do to regularize the situation?

13   A.   I think the account was closed.

14   Q.   Upon realizing that $175,000 was deposited in an Xethanol account, did you have any communications with John Murphy?

17   A.   I did -- actually, most communications with Mr. Murphy were with Mr. Skryanz.

20   Q.   My question is, did you have any communications with Mr. Murphy?

22   A.   I had brief discussions with Mr. Murphy.

24   Q.   What was the substance of those discussions?

1       CHRISTOPHER d'ARNAUD-TAYLOR
2       A.    I told him Mr. Skryanz was
3   instructed to close the account and clean
4   things up.
5       Q.    Did you note to Mr. Murphy the
6   displeasure of the deposit of this amount of
7   money into your account without your
8   knowledge?
9       A.    Yes.
10      Q.    What was Mr. Murphy's response
11  to that?
12      A.    I don't remember. I think it
13  was a one-way street.
14      Q.    Do you know if there was any
15  correspondence sent to Mr. or Mrs. Murphy
16  relative to the discovery of this amount of
17  money in an Xethanol account?
18      A.    I have no recollection of
19  specific correspondence.
20      Q.    Were there any e-mails sent, to
21  your knowledge?
22      A.    I don't have any recollection of
23  that. Most of the matters relating to that
24  were handled by Mr. Skryanz. I actually was
25  away at the time.

CHRISTOPHER d'ARNAUD-TAYLOR

Q. Upon discovering the deposit of this money into an Xethanol account at First Florida Bank, did you have any communications with anybody at the bank?

A. I didn't, but Mr. Skryanz did.

Q. Do you know with whom he spoke?

A. No.

Q. The third paragraph of this letter dated February 11, 2004 says, "Concurrently with the above, the Julian C. Murphy Revocable Trust had decided to purchase an additional 500,000 shares of Xethanol at 10 cents a share, for a total of $50,000."

Do you see that?

A. Yes, I do.

Q. Are you aware of whether that transaction actually occurred?

A. I believe it did.

Q. Was stock actually issued to the Julian C. Murphy Revocable Trust or its trustee?

A. I don't directly know right now. My quick answer, I couldn't find the specific

1    CHRISTOPHER d'ARNAUD-TAYLOR
2  stock certificate.
3    Q.    Reading on in that third
4  paragraph, the last sentence says, "These
5  shares were issued in the name of Thomas A.
6  Thomas, trustee."
7        Do you see that?
8    A.    I do.
9    Q.    Do you see anything on the stock
10 summary attached to the last page of
11 Exhibit 2 that would reflect that
12 transaction?
13   A.    It doesn't appear to be on that
14 list.  I can't see it anywhere.
15   Q.    Is there a reason why it would
16 not show up on this summary?
17   A.    I know of no reason.
18   Q.    Do you believe there to be a
19 stock certificate issued to Thomas A. Thomas,
20 trustee, to reflect the purchase of this
21 additional 500,000 shares?
22   A.    I don't know.
23   Q.    Do you have any reason to
24 believe that a stock certificate would not be
25 issued?

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2        A.    I have no direct recollection
 3   right now what happened at all.
 4        Q.    Do you think it would be
 5   customary for Xethanol to issue a stock
 6   certificate to someone who purchased 500,000
 7   shares of the company's stock?
 8        A.    It would be customary.  My
 9   answer is I just basically don't see it on
10   this list.  I don't know what this list
11   specifically relates to.
12        Q.    Sir, the loan transaction
13   between the Murphys and their entity and
14   First Florida Bank occurred in May 2002;
15   correct?
16        A.    Correct.
17        Q.    In May of 2002, the Murphys or
18   their entity deposited money into the
19   Xethanol Corporation's account at First
20   Florida Bank; correct?
21        A.    It would appear so.
22        Q.    Do you know why Mrs. Murphy in
23   February of 2004 is providing a notarized
24   explanation of those matters?
25        A.    I believe that our auditors
```

1        CHRISTOPHER d'ARNAUD-TAYLOR

2   requested it.

3        Q.    And why were your auditors

4   requesting an explanation of that?

5        A.    Because they are auditors.

6        Q.    And because the transaction was

7   not regular?

8        A.    Correct.

9        Q.    To your knowledge, did this

10  letter of February 11, 2004 satisfy the

11  auditor's concern?

12       A.    I have no specific recollection

13  of whether it did or whether it didn't. The

14  matter didn't die, so I concede that they

15  needed more information.

16       Q.    The matter did not die after

17  February 11, 2004?

18       A.    The auditors required more

19  information.

20       Q.    Was additional information

21  provided to them?

22       A.    I believe so, but I can't be

23  specific as to what it was.

24            MR. PALMER:  Let's take a break.

25            (A recess was taken.)

```
1        CHRISTOPHER d'ARNAUD-TAYLOR
2   BY MR. SPIVEY:
3        Q.   Mr. Taylor, I want to stay
4   focused on Exhibit 2 and some of the
5   attachments to it.  Specifically, I would
6   like to move to a memo from Mr. Skryanz to
7   you dated May 21, 2002.
8             Have you ever seen that before?
9        A.   I have.
10       Q.   What do you understand this to
11  be?
12       A.   Mr. Skryanz's trying to explain
13  to me what happened in Florida.
14       Q.   Prior to receiving this memo,
15  did you have some awareness of what happened
16  at First Florida Bank in Winter Park?
17       A.   I had some, that is why I asked
18  Mr. Skryanz to investigate and deal with the
19  situation.
20       Q.   To your use your terms, sir, had
21  you already gone ballistic before seeing the
22  memo?
23       A.   Yes.
24       Q.   And upon seeing the memo, did
25  your ballistic-ness change?
```

```
 1         CHRISTOPHER d'ARNAUD-TAYLOR
 2      A.    No.
 3      Q.    Did you become less ballistic or
 4 more ballistic?
 5      A.    As ballistic.
 6      Q.    Constant ballistic-ness?
 7      A.    Constant ballistic-ness.
 8      Q.    In points 3 and 4 of this memo
 9 dated May 21st, it says, "MLP deposited
10 $173,575 into our account at First Florida
11 Bank on May 3, 2002."
12            Number 4 then says, "On the same
13 day MLP (i.e., John Murphy, who is a
14 signatory of that account) then made the
15 following disbursements to the account."  And
16 it references disbursements totaling
17 $122,700.
18            Do you see that?
19      A.    I do.
20      Q.    Do you understand those
21 disbursement were made from the Xethanol
22 account?
23      A.    This is a post event memorandum.
24 Did I authorize those payments out of the
25 Xethanol account, is that the question?
```

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2     Q.   No, I am trying to find out the
 3  $122,700 that is referenced there.  Is it
 4  your understanding that that money came from
 5  the Xethanol account?
 6     A.   That is my understanding.
 7     Q.   I am gathering from your
 8  question or statement that you in no way
 9  authorized those disbursements?
10     A.   No.
11     Q.   Looking at the list of parties
12  there who received disbursements, do you know
13  who or what they are?
14     A.   I know who some of them are.
15     Q.   Tell me the ones that you know.
16     A.   I know of TREP.
17     Q.   What do you know of or about
18  TREP?
19     A.   TREP was an enterprise known as
20  Technology Real Estate Partners.
21     Q.   Did you have any involvement in
22  that entity?
23     A.   Not in TREP, no.
24     Q.   Did you have any involvement in
25  an affiliated entity?
```

1      CHRISTOPHER d'ARNAUD-TAYLOR
2            MR. PALMER: Objection to the
3      form. "You" meaning Xethanol?
4      Q.    Or you?
5      A.    I was a shareholder, at one
6  point in time expected to be a director of
7  VSM.
8      Q.    And you're referring to you,
9  yourself personally, now?
10     A.    Yes.
11     Q.    Did you ever, in fact, become a
12 shareholder of VSN?
13     A.    Yes, I did.
14     Q.    Did you become an officer of
15 VSN?
16     A.    No, I did not become an officer
17 of VSN.
18     Q.    Did you ever become a
19 shareholder or officer of TREP?
20     A.    No.
21     Q.    So you recognize TREP and you
22 recognize VSN on this list?
23     A.    I recognize VSB as well.
24     Q.    What is VSB?
25     A.    Very Smart Building.