CHRISTOPHER d'ARNAUD-TAYLOR

Q. Did you ever have any involvement in that entity?

A. I had involvement in that entity.

Q. What was your involvement?

A. I was a shareholder.

Q. Matthews and James, do you recognize that?

A. I have no idea.

Q. TREP again, same entity?

A. I am assuming it's the same entity.

Q. Next reference is to Kerman; do you know what that is?

A. No.

Q. The next reference is to J. Murphy, Jr.; do you believe that to be Mr. Murphy?

A. I assume so.

Q. Did you ever ask Mr. Murphy why he was disbursing through the Xethanol account $25,000 to himself personally?

A. No.

Q. Did that concern you?

CHRISTOPHER d'ARNAUD-TAYLOR

2  A. The whole thing concerned me.

3  Q. Was Xethanol a publicly traded company in 2002?

5  A. No.

6  Q. Is it publicly traded today?

7  A. It is.

8  Q. When did the company go public?

9  A. February 2005.

10 Q. The next disbursement appears to be to MLP; who did you understand that to be?

12 A. I have no idea.

13 Q. On point 5, it says, "Of the above balance, John Murphy (MLP) used $50,000 to purchase $500,000 shares of Xethanol at 10 cents per share."

17 Do you know to whom that was issued?

19 A. I don't know specifically, but I am sure it's in the records.

21 Q. Did you, upon discovering this irregular transaction, ask or request Mr. Murphy or his entities to purchase stock in Xethanol?

25 A. There had been previous

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2   discussions about them purchasing some stock
 3   in Xethanol at 10 cents a share.
 4        Q.   Did your discovery in this
 5   situation in any way accelerate or affect the
 6   timing of the purchase of those shares?
 7        A.   I can't remember exactly, but I
 8   am sure it did.
 9        Q.   Why do you think it affected the
10   timing of the transaction?
11        A.   Because I instructed Mr. Skryanz
12   to clean the whole thing up.
13        Q.   To the extent Xethanol received
14   $50,000 for a stock purchase in approximately
15   May of 2002, how would that be reflected on
16   Xethanol's books and records?
17        A.   It would be reflected, as he
18   indicates here, as a sale of $500,000 shares.
19   It would be in the stock ledger, in the stock
20   book, if it's anywhere.
21        Q.   Would the $50,000 be reflected
22   as a capital contribution?
23        A.   Yes.
24        Q.   I want to go to the final page
25   of Exhibit 2 and then go back to Mr. Murphy's
```

```
 1         CHRISTOPHER d'ARNAUD-TAYLOR
 2   letter to you of August 1, 2003.
 3              I believe you told me that in
 4   response to Mr. Murphy's letter of August 1,
 5   2003, the stock certificate number 110 was
 6   issued; correct?
 7         A.   I believe so.
 8         Q.   And in Mr. Murphy's letter to
 9   you of August 1, 2003, he requested that the
10   stock formerly issued to the Rolls be
11   canceled and issued to Patrick A. Railly for
12   the benefit of the trust of John J. Murphy,
13   Jr.?
14         A.   Yes.
15         Q.   Do you have any reason to
16   believe that the stock was reissued in any
17   manner other than as Mr. Murphy requested in
18   this correspondence?
19              MR. ROTELLA:  Objection to the
20         form of the question.
21         A.   I don't have any reason to
22   believe that.
23         Q.   Just to be clear, you would have
24   followed the direction of Mr. Murphy as set
25   forth in his letter of August 1, 2003?
```

1       CHRISTOPHER d'ARNAUD-TAYLOR
2           MR. ROTELLA: Objection to the
3   form of the question.
4       A.    I believe, yes.
5       Q.    Looking at the stock summary at
6   the end of Exhibit 2, we see that stock
7   certificate 110 was later sold and replaced
8   by other stock certificates; correct?
9       A.    It would appear so.
10      Q.    Just walk me through what you
11  understand the notes to mean that are beside
12  or referenced to certificate number 110.
13      A.    110 was derived from certificate
14  49 and 70.
15      Q.    Which was the Rolls?
16      A.    The Rolls, and sold to a third
17  party and was replaced by 148, 149, 164
18  through 166 and 183.
19      Q.    Let's look at those if we could,
20  sir. Stock certificate 148 is to a person
21  named Rous Terise?
22      A.    Yes.
23      Q.    Is that a man or woman?
24      A.    It is a woman.
25      Q.    Who is she?

CHRISTOPHER d'ARNAUD-TAYLOR

A. She is the girlfriend of Scott Smith.

Q. As we sit here today, is she still his girlfriend?

A. She is indeed.

Q. I don't know if her name changed or anything of that nature.

A. No. They live together.

Q. Is it your belief that Rous Terise purchased 50,000 shares of the 300,000 shares that were in the name of Patrick A. Railly, trustee?

A. It would appear so.

Q. Do you have any knowledge of that stock sale transaction?

A. I was aware they were discussing things.

Q. Do you know who received the proceeds of such a stock sale?

A. No.

Q. Is there somebody within Xethanol who would be able to tell me that?

A. I think it was a private transaction between the shareholders.

1        CHRISTOPHER d'ARNAUD-TAYLOR

2        Q.    Is there anyone within Xethanol
3   that would be able to tell me the details of
4   that private transaction?

5        A.    I don't believe so.

6        Q.    Stock certificate number 149
7   references Smith W. Scott.

8              That is Scott Smith, I take it?

9        A.    Yes.

10       Q.    And the prior reference to Rous,
11  Terise has the last name first; correct?  Her
12  real name is Terise Rous?

13       A.    Yes, and his real name is Scott
14  Smith.

15       Q.    Besides stock certificate 148
16  and 149, there appears the date 8-3-04.

17             Do you see that?

18       A.    Yes.

19       Q.    What do you understand that date
20  to reflect?

21       A.    I have no understanding of what
22  that reflects, but probably the date of
23  issuance of that stock.

24       Q.    Which may or may not reflect the
25  date of the sale?

```
1        CHRISTOPHER d'ARNAUD-TAYLOR
2        A.    It may or may not.
3        Q.    Number 164 is Jasmine Consulting
4   Inc.
5              What is that entity?
6        A.    It's a consulting entity owned
7   by Mr. Smith.
8        Q.    Do you personally have any
9   involvement in that entity?
10       A.    In Jasmine?
11       Q.    Yes.
12       A.    No.
13       Q.    To your knowledge, does
14  Mr. Murphy have any involvement in Jasmine?
15       A.    Not to my knowledge, he does
16  not.
17       Q.    To your knowledge, do Mr. Smith
18  and Mr. Murphy have any business dealings
19  between them or had they had any business
20  dealings between them?
21       A.    Yes.
22       Q.    What business dealing are you
23  aware of those two gentlemen having?
24       A.    Mr. Smith was originally
25  involved in Very Smart Network and Very Smart
```

CHRISTOPHER d'ARNAUD-TAYLOR

Business.

    Q.   Any other business dealings with them other than those Very Smart entities that you are aware of?

    A.   I think they are looking at something together right now. I don't know of anything specifically. To the best of my knowledge, I don't know of any other business relationship substantive to them.

    Q.   As you sit here today, sir, are you aware of Mr. Murphy having any means of income?

    MR. ROTELLA: Are you taking about today's day and age?

    MR. SPIVEY: Right now.

    MR. ROTELLA: Discovery was cut off on September 28, 2005. That is the last day for you to look into Mr. Murphy's life. I am making an objection. I can't instruct the witness not to answer. The court order has made that the cutoff date.

    My recollection as of September 28th of 2005, I don't have

1   CHRISTOPHER d'ARNAUD-TAYLOR

2   my court order in front of me.

3   Whatever that date is, the present is

4   past that date and I object and any

5   answer the witness may give I move to

6   strike.

7       A.   Can you ask me the question

8   again?

9       Q.   As you sit here today, are you

10  aware of Mr. Murphy having any gainful

11  employment?

12      A.   My only knowledge of

13  Mr. Murphy's activities in life was that he

14  was related with Epiphany Partners.  As to

15  what Epiphany does to generate revenue

16  streams, I don't know.

17      Q.   How about as of September of

18  2005, did you have any understanding as to

19  Mr. Murphy's employment or avocation or

20  sources of income?

21      A.   The only thing that I know, they

22  were limited.

23      Q.   Do you believe they changed at

24  any time subsequent to September of 2005?

25          MR. ROTELLA:  Same objection.