1    CHRISTOPHER d'ARNAUD-TAYLOR
2         Move to strike any answer.
3         A.   I have no knowledge of the
4    specific arrangements between him and
5    Epiphany.  I know of no other means of him
6    generating an income stream.
7         Q.   Did you ever have an occasion,
8    sir, to see any personal financial statements
9    of John J. Murphy?
10        A.   The only time I think I saw a
11   personal financial statement of John J.
12   Murphy was way, way back when I first met
13   him.
14        Q.   In approximately 2001?
15        A.   Yes.
16        Q.   And what was the occasion for
17   you seeing his financial statement in that
18   period of time?
19        A.   Because he was trying to raise
20   capital into Very Smart Networks at one time.
21        Q.   Reassuming focus on this
22   Xethanol spread sheet.
23             Stock certificate number 183 was
24   apparently a derivative of 110, if I am
25   understanding that correctly; is that

1      CHRISTOPHER d'ARNAUD-TAYLOR

2  correct?

3      A.    That would appear to be the

4  case.

5      Q.    Am I understanding that to be

6  that Patrick Railly as trustee sold 100,000

7  shares to Patrick Railly, trustee?

8      A.    I don't think that is what it

9  says. I think it was the residual of the

10  breakup of 110. And then it was subsequently

11  sold and replaced by certificates 188, 189

12  and 190. I believe that is what it says.

13      Q.    Well, 110, it says, "Sold and

14  replaced by 148, 149, 164 to 166 and 183"; am

15  I correct?

16      A.    Can I borrow your pen?

17      MR. ROTELLA: Is that an exhibit

18      for the court reporter? You cannot

19      write on that.

20      THE WITNESS: Sorry about that.

21      A.    I believe that that 100

22  constitutes the balance of the certificate

23  110, which was then broken up. I believe

24  that is what it says. If you add the Rous,

25  you add what, 148, 149, 164 and 165 and 183,

LEGALINK, A MERRILL CORPORATION
(800) 325-3376    www.Legalink.com

1        CHRISTOPHER d'ARNAUD-TAYLOR

2  they come to the 300.

3      Q.   Is there a reason, though, that

4  that a new certificate would be issued to

5  Mr. Railly?

6      A.   If you're breaking up a

7  certificate, you would reissue the residual.

8      Q.   That is what you believe

9  happened based on your analysis of the spread

10  sheet?

11      A.   That would appear to be the

12  case.

13      Q.   Sir, let me show you what we

14  will mark as Exhibit 5.

15        Have you ever seen this document

16  before?

17        (Document marked for

18        identification, Exhibit 5.)

19      A.   No.

20      Q.   Are you aware that Rivertree

21  Landing issued a subpoena to Xethanol?

22      A.   Yes.

23      Q.   Did you have any involvement in

24  the gathering or collection of documents that

25  were responsive to the subpoena?

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2        A.    No.
 3        Q.    Do you know who did?
 4        A.    Franz Skryanz.
 5        Q.    How do you know that?
 6        A.    Because he was the only person
 7   who would have.
 8        Q.    Did you have any discussions
 9   with Mr. Skryanz about responding to the
10   subpoena?
11        A.    I didn't have any specific
12   conversations with him at all.
13        Q.    On page 4 of Exhibit 5, giving
14   some description of what was requested of
15   Xethanol and the first such item was, "Any
16   and all documents (i.e., checks, money
17   orders, wire transfers, stock certificates or
18   correspondence) relating to the ownership of
19   any stock in Xethanol Corporation by any of
20   the following persons or entities at any time
21   between June 1, 2001 through September 28,
22   2005."
23              And then there are listed
24   persons and entities from A through R;
25   correct?
```

1    CHRISTOPHER d'ARNAUD-TAYLOR
2        A.    Correct.
3        Q.    And attached to Exhibit 5 is the
4    only document that Xethanol produced in
5    response to the subpoena; correct?
6        A.    It would appear to be the case.
7        Q.    Do you believe, sir, that the
8    Julian C. Murphy Revocable Trust in 1998
9    owned any shares in Xethanol at any time?
10       A.    I couldn't answer which specific
11   Revocable Trust owned shares in Xethanol
12   Corporation.  I don't know.  I don't think
13   so.
14       Q.    Do you have any reason to doubt
15   that?
16       A.    I just don't have direct
17   knowledge.
18       Q.    We have seen in the prior
19   document, Exhibit 2, a reference to Thomas A.
20   Thomas acting as trustee of the Julian C.
21   Murphy Trust.
22             Do you see that?
23       A.    Yes, I do.
24       Q.    Is there a reason, sir, that I
25   did not receive any checks, money orders,

CHRISTOPHER d'ARNAUD-TAYLOR

1
2  wire transfers, stock certificate or
3  correspondence relating to the 750,000 shares
4  of Xethanol Corporation stock that were
5  issued to the trustee of the Julian C. Murphy
6  Trust?
7       A.   I don't know.
8       Q.   Do you believe that there are
9  Xethanol documents, such as checks, money
10 orders, wire transfers, stock certificates or
11 correspondence, that would relate to the
12 purchase or retitling of those 750,000
13 shares?
14      A.   It would appear that there are.
15      Q.   I am trying to find out why I
16 didn't receive any documents corresponding to
17 that request.
18      A.   I don't know.
19      Q.   Do you believe the company had
20 those documents?
21      A.   If it was the same documents
22 that were in the former exhibit, I believe
23 they are.
24      Q.   Even in the former exhibit, sir,
25 I assume you are referring to Exhibit 2?

|    |    |
|----|----|
| 1  | CHRISTOPHER d'ARNAUD-TAYLOR |
| 2  | A.    Yes. |
| 3  | Q.    I didn't get any checks, money |
| 4  | orders, wire transfers or stock certificates, |
| 5  | did I? |
| 6  | A.    I believe not. |
| 7  | Q.    I am trying to find out if you |
| 8  | would provide any information why I didn't |
| 9  | receive any of the requested materials. |
| 10 | A.    I cannot. |
| 11 | Q.    Going back to Exhibit 2, we also |
| 12 | see a letter from Mr. Murphy dated August 1, |
| 13 | 2003 requesting you to reissue stock to |
| 14 | Patrick A. Railly for the benefit of the |
| 15 | trust of John J. Murphy, Jr.; correct? |
| 16 | A.    Correct. |
| 17 | Q.    On Exhibit 5, John J. Murphy, |
| 18 | Jr. is referenced in paragraph A; correct? |
| 19 | A.    Yes. |
| 20 | Q.    Can you provide any explanation |
| 21 | why I didn't receive any checks, money |
| 22 | orders, wire transfers, stock certificates or |
| 23 | correspondence relating to that? |
| 24 |         MR. PALMER:  Objection to the |
| 25 |     form. |

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2        A.   I don't know, but it does not
 3   mention the John J. Murphy Trust.
 4        Q.   If I reissued a subpoena to you,
 5   do you think you would be able to fully
 6   comply with it?
 7             MR. PALMER:  Objection to the
 8        form.
 9        A.   I think Xethanol may be.
10        Q.   I meant Xethanol of course.
11        A.   Yes.
12             MR. SPIVEY:  Counsel, I don't
13        mean to be confrontational at all,
14        but I do want to get the requested
15        documents.
16             MR. PALMER:  We would be more
17        than happen to provide them.  I just
18        don't know what they have.  I don't
19        know if there are any.
20             MR. SPIVEY:  I am troubled from
21        a standpoint that I flew in from
22        Florida to do this and I didn't get
23        everything that I wanted.
24             It may necessitate another trip
25        back here.  I am just trying to get
```

CHRISTOPHER d'ARNAUD-TAYLOR

1
2    the information in the most
3    nonconfrontational fashion possible.
4    Can we come to some agreement on this?
5         MR. PALMER: Yes.
6         MR. SPIVEY: What can we do,
7    gentlemen?
8         MR. PALMER: What do you mean,
9    what can we do?
10        MR. SPIVEY: Specifically, when
11   can I get the documents that should
12   have been produced weeks ago in
13   response to this subpoena?
14        MR. PALMER: I guess we have to
15   ask Franz. Whatever is out there we
16   provided you as quickly as we could,
17   what was responsive, and we discussed
18   this deposition as quickly as we
19   could. I believe we were operating
20   under a pretty limited time frame. We
21   got on board and we tried to be as
22   responsive as we can.
23        MR. ROTELLA: Is there any
24   chance of us breaking and making a
25   phone call to see if Franz has the

1  CHRISTOPHER d'ARNAUD-TAYLOR
2  stock certificates, correspondence or
3  money wires or checks that could be
4  faxed here?  Can we see if he is
5  around to do that?
6      THE WITNESS:  Are we on the
7  record?
8      MR. ROTELLA:  Yes.
9      THE WITNESS:  He had a medical
10 event last night.  So he will be out
11 of commission.  He had to leave the
12 board meeting earlier yesterday.
13     MR. SPIVEY:  We will address
14 this at a break.  I am not trying to
15 be hostile with anybody, but I just
16 want to get information.  I am sure
17 you don't want to make the trip back
18 here as well.
19     MR. PALMER:  Off the record.
20     (Off the record.)
21     MR. SPIVEY:  We are back on the
22 record.
23     Counsel have had a very cordial
24 conversation about possible
25 supplementation of Xethanol's response