CHRISTOPHER d'ARNAUD-TAYLOR

Q. Do you know why you are being copied on this?

A. No.

Q. Did you have any involvement in this actual or proposed transaction?

A. No.

Q. Did you at some point, sir, become aware that the Julian C. Murphy Trust was seeking to sell a significant number of shares in Xethanol?

A. I was aware.

Q. How did you become aware of that?

A. Because of the situation with originally with Mr. Smith.

Q. What situation, sir?

A. Selling stock to Mr. Smith.

Q. Did you ever have any understanding as to why such shares were being sold?

A. No.

Q. Did you ever inquire?

A. No.

Q. Let me hand you another document

CHRISTOPHER d'ARNAUD-TAYLOR

1
2   we will mark as Exhibit 7.  It appears to be
3   a letter from Mr. Railly to Franz Skryanz at
4   Xethanol dated January 19, 2004, and attached
5   to it is what appears to be a handwritten
6   note from Mr. Skryanz back to Mr. Railly.
7          Have you ever seen these
8   documents before?
9       A.   I don't believe so.
10           (Letter marked for
11      identification, Exhibit 7.)
12      Q.   On the second page of Exhibit 7,
13  do you recognize that to be Mr. Skryanz's
14  handwriting?
15      A.   Yes.
16      Q.   Let me show you, sir, something
17  that will be marked as Exhibit 8.  This is a
18  letter from Mr. Railly to you dated July 7,
19  2004.
20           Have you ever seen that before?
21      A.   No.
22           (Letter dated 7-7-04 marked for
23      identification, Exhibit 8.)
24      Q.   Do you recall receiving it?
25      A.   Well, it's -- although it's

1   CHRISTOPHER d'ARNAUD-TAYLOR

2   addressed to me, it's actually sent to Franz

3   Skryanz.

4   Q.  The address there, 30 East 81st

5   Street, Apartment 4-D, that is Mr. Skryanz's

6   address?

7   A.  Yes.

8   Q.  The second paragraph of this

9   letter say, "These shares are being tendered

10  for sale at the price of 97 cents a share,

11  for a total of $438,440.

12      Did you have any understanding

13  as to why Mr. Railly was sending these stock

14  certificates to you?  I say "you," I mean

15  Xethanol.

16  A.  No, I have no specific idea what

17  he was doing.

18  Q.  Is that customary, sir, for your

19  shareholders to send to you stock

20  certificates to be held in trust until a sale

21  is consummated?

22  A.  No, I don't think that is

23  customary at all.

24  Q.  Did you have any reason to think

25  that did not happen in respect to this

1       CHRISTOPHER d'ARNAUD-TAYLOR
2  correspondence?
3       A.    I cannot speak to this
4  correspondence.  I don't recall ever seeing
5  it.
6       Q.    Do you have any reason to
7  believe that the correspondence is not
8  genuine or --
9            MR. PALMER:  Objection to the
10       form.
11       A.    I have no idea.  I have no idea
12  of what it says or why it says it.
13       Q.    Sir, who is Andrew Taylor
14  Kimmens?
15       A.    He is an individual.
16       Q.    Does he have some affiliation
17  with Xethanol?
18       A.    Not with Xethanol, no.
19       Q.    Does he have some affiliation
20  with London Manhattan Limited?
21       A.    No affiliation, no.
22       Q.    Does he have an e-mail address
23  at London Manhattan Limited?
24       A.    No.
25       Q.    To your knowledge, has he ever

1      CHRISTOPHER d'ARNAUD-TAYLOR

2  had an e-mail address at London Manhattan?

3      A.   He may have once.

4      Q.   Would you be able to explain why

5  he would have an e-mail address at London

6  Manhattan?

7      A.   Because he was going to be doing

8  some work for London Manhattan.

9      Q.   What kind of work?

10     A.   We were looking into the

11 minerals business.  I actually do not recall

12 him having an e-mail address at London

13 Manhattan, but it may have happened.

14     Q.   Let me show you something that

15 is going to be marked as Exhibit 9.  This

16 appears to be an e-mail from Andrew Taylor

17 Kimmens to Patrick Railly dated July 16,

18 2004, subject: Julian C. Murphy Trust.

19          And it reflects Mr. Kimmens as

20 having an e-mail address at London

21 Manhattan.com.

22          Do you see that?

23     A.   I do see that.

24          (E-mail marked for

25          identification, Exhibit 9.)

CHRISTOPHER d'ARNAUD-TAYLOR

Q.  Does that surprise you?

A.  It does not surprise me.  There was a temporary stage when he was going to be working with London Manhattan, but that changed.

Q.  Let me hand you something, sir, that we will mark as Exhibit 10.

Sir, I handed you something that is going to be marked as Exhibit 10.  It appears to be an e-mail from Mr. Railly to Mr. Skryanz and it appears that you received a copy of this; correct?

MR. PALMER:  Objection to the form.

(E-mail marked for identification, Exhibit 10.)

A.  If it says that, then it would be correct.

Q.  Do you see the cc there?

A.  I see the cc.

Q.  Do you have any reason to believe that you did not receive the e-mails?

A.  Numerous e-mails do not come through because of spam and whatnot.  I don't

1       CHRISTOPHER d'ARNAUD-TAYLOR
2  remember reading this one because, as it says
3  here, I believe I was traveling.
4       Q.   Excuse me?
5       A.   As it says here, I believe I was
6  traveling.
7       Q.   The substance of this says, from
8  Mr. Railly, "Andrew Taylor Kimmens requested
9  that I send the following message to Chris
10 Taylor concerning the tender of the Julian C.
11 Murphy Revocable Trust, 452,000 shares of
12 Xethanol stock on July 8th. Laurie at John
13 Murphy's office called and informed me that
14 she had just spoken with Chris, who
15 instructed her to cause me to direct this
16 message to you instead, due to Chris
17 traveling abroad this weekend."
18           Do you know Laurie at John
19 Murphy's office?
20      A.   I don't recall specifically who
21 Laurie was.
22      Q.   Did you find this tender of
23 452,000 shares to Xethanol to be unusual?
24      A.   I don't think it was between
25 Xethanol, as I could see.

CHRISTOPHER d'ARNAUD-TAYLOR

2    Q.    Who do you --

3    A.    I don't understand the use of
4 the word "tender" here, indication of the
5 word "tender."

6    Q.    Who do you think was holding the
7 stock?

8    A.    I know that, I assume the stock
9 was held. I specifically cannot tell you.

10   Q.    Are you familiar, sir, with an
11 entity called GH Venture Partners LLC?

12   A.    I am.

13   Q.    And what do you know about that
14 entity?

15   A.    It's a venture capital company
16 and Andrew Kimmens used to office with them
17 and work with them.

18   Q.    Are you aware of GH Venture
19 Partners LLC ever being a shareholder in
20 Xethanol?

21   A.    I believe they did not become a
22 shareholder in Xethanol.

23   Q.    Do you know why?

24   A.    No, I don't think they are a
25 shareholder in Xethanol.

CHRISTOPHER d'ARNAUD-TAYLOR

Q.    Exhibit 10 seems to indicate some proposal or agreement whereby it would become a shareholder, and if I understand you correctly, that transaction was never consummated?

A.    I wasn't a party to the transaction and third-party transaction.  So I don't know what happened between GHH Partners and Kimmens.

Q.    I understand, but as sit you here today, it is your understanding that GHH Venture Partners was never a shareholder in Xethanol?

A.    I don't believe it was ever sold, but there are many shareholders.

Q.    How many shareholders are there?

A.    Right now?

Q.    Correct.

A.    I really don't know.  Probably the company has 27 million shares outstanding.

Q.    Let me show you, sir, what we will mark as Exhibit 11.  It appears to be a letter from Mr. Railly to Xethanol

```
 1            CHRISTOPHER d'ARNAUD-TAYLOR
 2   Corporation, no specific addressee.
 3            Have you seen this letter
 4   before?
 5        A.   Not to the best of my knowledge.
 6            (Letter marked for
 7        identification, Exhibit 11.)
 8        Q.   Have you ever heard of Trafalgar
 9   Capital Group, Inc.?
10        A.   Yes, I have.
11        Q.   What do you know about that
12   entity?
13        A.   It was an entity that I believed
14   was formed and organized by John Murphy when
15   he was a resident in Jacksonville.  And it
16   was an entity that was -- he was looking to
17   do some business with, with myself and
18   Mr. Kimmens.
19        Q.   What was the underlying business
20   mission or line of work of Trafalgar Capital
21   Group?
22        A.   I am not sure of what his
23   underlying business was.  I think it was in
24   the form of asset guarantee work.  Our
25   association was it was related primarily to
```