CHRISTOPHER d'ARNAUD-TAYLOR

mineral assets.

Q.     Were you ever personally a
shareholder of Trafalgar?

A.     I was never a shareholder of
Trafalgar.

Q.     Were you ever an officer or
director?

A.     I think they appointed me as
director at one point.

Q.     To your knowledge, was
Mr. Murphy ever an officer or shareholder or
director of Trafalgar?

A.     I presumed him to be.

Q.     You presumed him to be what?

A.     Chief executive.

Q.     Did you presume him to be a
shareholder of the company?

A.     I don't know, but I presumed him
to be.

Q.     To your knowledge, has Trafalgar
ever acquired any shares of Xethanol?

A.     I don't believe so.

Q.     Sir, let me hand you what we
will mark as Exhibit 12.  It appears to be an

1       CHRISTOPHER d'ARNAUD-TAYLOR

2   e-mail from Mr. Railly to Mr. Skryanz.

3           Do you recognize that to be

4   Mr. Skryanz's e-mail address?

5           A.    I do, yes.

6               (E-mail marked for

7           identification, Exhibit 12.)

8           Q.    That is KATHSKR@AOL.com.

9           Do you know of Mr. Skryanz

10  having other e-mail addresses?

11          A.    He may, but I believe that is

12  the only one he uses.

13          Q.    This e-mail references in the

14  second paragraph, the trust having chosen to

15  sell 100,000 shares of Xethanol common stock

16  to W. Scott Smith and Terise Rous for

17  $50,000.

18          Are you aware of that

19  transaction being consummated?

20          A.    I don't know if this was the

21  specific transaction consummated, but I was

22  aware of the selling of stock to Terise Rous.

23          Q.    Do you have any explanation for

24  why Mr. Taylor Kimmens would be copied on

25  this type of communication?

1    CHRISTOPHER d'ARNAUD-TAYLOR

2        A.    It seems to me that Mr. Patrick

3    Railly copies people indiscriminatively.

4        Q.    Did Mr. Taylor Kimmens have any

5    involvement in transferring stock for

6    Xethanol or any --

7        A.    None whatsoever.

8        Q.    Have you ever met Mr. Railly?

9        A.    I don't know.  It's a quick

10   answer.  Was he up to Infantimo & Berman?

11       Q.    Yes.

12       A.    Then I probably did meet him.

13       Q.    Let me hand you, sir, what we

14   will mark as Exhibit 13.  It appears to be

15   another e-mail from Mr. Railly to Mr. Skryanz

16   concerning the Julian C. Murphy Revocable

17   Trust Xethanol stock.

18            Have you ever seen this e-mail

19   before, sir?

20       A.    No, I don't believe I have.

21            (E-mail marked for

22            identification, Exhibit 13.)

23       Q.    What is the document retention

24   policy at Xethanol?

25       A.    I think the document retention

1    CHRISTOPHER d'ARNAUD-TAYLOR

2    policy at Xethanol when it was a private

3    company, kept whatever it could.  Now that is

4    public, it retains it's trail very

5    vigorously.

6        Q.    Would it be your expectation

7    that the company retain copies of e-mails,

8    correspondence and other related documents to

9    transfers of stock in the company?

10            MR. PALMER:  Objection to the

11        form.  At what time?

12       Q.    How about in 2004?

13       A.    I think he would have used its

14   best efforts to do that, but it was not

15   officially.  It was not organized in the

16   suite of offices and things like that.

17       Q.    Do you know whether Mr. Skryanz

18   has the technical capacity to retain and save

19   e-mails?

20       A.    I would doubt it.

21       Q.    And why is that, sir?

22       A.    Because he only more recently

23   became more digitally -- I mean he would have

24   that capacity now.

25       Q.    When do you think Mr. Skryanz

1      CHRISTOPHER d'ARNAUD-TAYLOR

2  acquired that capacity?

3      A.    Progressively.

4      Q.    In the 2004 time frame, how

5  would you characterize his digital

6  competence?

7      A.    Limited.

8      Q.    So if I am understanding you

9  then, his digital competence has increased

10  substantially in the last 18 months or so?

11      A.    Yes.

12      Q.    To your knowledge, has he gone

13  to any computer classes or undergone any

14  technical training at any time?

15      A.    I think it's been on-the-job

16  training.  He now operates out of an office

17  with a real computer.

18      Q.    Let me show you our next

19  exhibit, which is 14.  It appears to be

20  another e-mail from Mr. Railly to Mr. Skryanz

21  regarding the Julian C. Murphy Trust.

22          Have you ever seen this document

23  before?

24      A.    I don't think so.

25          (E-mail marked for

1    CHRISTOPHER d'ARNAUD-TAYLOR

2       identification, Exhibit 14.)

3       Q.    Sir, at some point you became

4    aware of your appearance at the deposition

5    today; correct?

6       A.    Yes.

7       Q.    And you were aware that it

8    related to John Murphy in some capacity;

9    correct?

10       A.    Yes.

11       Q.    Did you ever call Mr. Murphy and

12    say what the heck is this all about?

13       A.    I called him a long time ago and

14    said what is going on.

15       Q.    And what prompted you to call

16    him and say what is going on?

17       A.    You get a subpoena to provide

18    information, you want to know what is going

19    on.

20       Q.    What did he tell you in response

21    to that inquiry?

22       A.    I have to be candid?

23       Q.    Yes.

24       A.    I think he implied that you felt

25    he had a pot of gold somewhere hidden away

1      CHRISTOPHER d'ARNAUD-TAYLOR

2   and that you were trying to find it.

3      Q.    Anything else?

4      A.    No.

5      Q.    Let me show you, sir, what will

6   be marked as Exhibit 15.  It appears to be an

7   e-mail to Mr. Skryanz dated November 2, 2004.

8           Do you recognize the e-mail

9   address of the sender of this document?

10     A.    No, I don't.

11          (E-mail dated 11-2-04 marked for

12          identification, Exhibit 15.)

13     Q.    JMJR, do you recognize that to

14  be John Murphy, Jr.?

15     A.    I would assume that to be him.

16     Q.    Do you know whether Mr. Murphy

17  has a Blackberry device?

18     A.    He does currently have a

19  Blackberry device, yes.

20     Q.    How long has Mr. Murphy had a

21  Blackberry device, to your knowledge?

22     A.    I can't be specific, but I would

23  suspect -- I haven't noticed, but I know he

24  has a Blackberry now which he uses all the

25  time.

CHRISTOPHER d'ARNAUD-TAYLOR

1

2    Q.    Would it appear he had a

3    Blackberry from as far back as 2004?

4         MR. ROTELLA:  Objection to the

5    form.

6    A.    It would appear that way.

7    Q.    Do you know whether the

8    Blackberry address of Mr. Murphy was other

9    than the one that you gave me earlier?

10   A.    I don't know what his Blackberry

11   address is, but I know that his e-mail is

12   JMJR590.

13   Q.    Currently, if you get an e-mail

14   from Mr. Murphy from his Blackberry, it would

15   bear the same address as it would if he were

16   on his desktop or laptop?

17   A.    I belive so.

18        MR. SPIVEY:  Let's take a break

19   right now.

20        (A recess was taken.)

21   BY MR. SPIVEY:

22   Q.    Mr. Taylor, let me hand you what

23   we will mark as Exhibit 16.  This is a

24   collection of documents in which there is a

25   purple flag on the seventh or so page of it.

1       CHRISTOPHER d'ARNAUD-TAYLOR

2              It reflects that on July 22,

3       2003 London Manhattan wired to Mr. Murphy

4       $5,000.  Do you see that?

5              A.    Yup.

6                    (Documents marked for

7              identification, Exhibit 16.)

8              Q.    Do you have any understanding or

9       explanation for what that transfer would have

10      been for?

11             A.    Probably a loan.

12             Q.    Did London Manhattan make loans

13      to Mr. Murphy from time to time?

14             A.    Mr. Murphy had previously made

15      loans to London Manhattan.

16             Q.    Do you know whether this was a

17      loan or a loan repayment or what?

18             A.    I don't know whether this was a

19      loan or loan repayment.  It was part of a

20      relationship.

21             Q.    To the extent there were loans

22      and/or repayments of loans, would there be

23      documentation reflecting the existence of the

24      debt or repayment of the debt?

25             A.    You mean promissory notes or

1        CHRISTOPHER d'ARNAUD-TAYLOR

2   anything?

3        Q.    E-mails, letters, agreements,

4   anything?

5        A.    Well, there would be no

6   agreements, no.

7        Q.    It would have been done

8   verbally?

9        A.    Yes.  There may be one or two

10  things that confirm it, but by and large it

11  was a verbal relationship.

12       Q.    Is there any other explanation

13  for you, I say "you," London Manhattan

14  sending money to Mr. Murphy from time to time

15  from 2003 to 2004?

16       A.    No.

17       Q.    I am not trying to put words in

18  your mouth.

19            To the extent we see paperwork

20  reflecting transfers of money from London

21  Manhattan to Mr. Murphy, are you suggesting

22  to me they would all be repayments of loans

23  to Mr. Murphy from London Manhattan?

24       A.    Generally, yes.

25       Q.    Would there be any other basis