```
1        CHRISTOPHER d'ARNAUD-TAYLOR
2   for London Manhattan paying money to
3   Mr. Murphy?
4        A.    We advanced some money to
5   Mr. Murphy in connection with a possible
6   transaction.  And we advanced some money to
7   Mr. Murphy in connection with the Trafalgar
8   deal.
9        Q.    When did you do that?
10       A.    Would have been sometime in
11  2004.
12       Q.    To the extent that you sent
13  money to Mr. Murphy, where would you send it?
14       A.    The quick answer is that it
15  would have been done by Franz Skryanz and I
16  don't know what the transaction would be.
17       Q.    To the extent money was
18  transferred from London Manhattan to
19  Mr. Murphy, would you be the person that
20  authorized the remittance of that money?
21       A.    Yes.
22       Q.    And then Mr. Skryanz would have
23  just carried out your directive?
24       A.    Yes.
25       Q.    What is the total amount of
```

LEGALINK, A MERRILL CORPORATION
(800) 325-3376     www.Legalink.com

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2   money that Mr. Murphy loaned to London
 3   Manhattan Limited?
 4        A.    I can't tell you exactly.
 5        Q.    Can you give me a ball park?
 6        A.    I think the whole thing was
 7   something like $40,000.
 8        Q.    When were those loans made?
 9        A.    Mostly 2003.
10        Q.    And to the extent Mr. Murphy
11   extended money to London Manhattan, where did
12   that money come from?
13        A.    I don't know.
14        Q.    Personal accounts?
15        A.    I can't be specific, but I think
16   they were, yes.
17        Q.    Would Mr. Skryanz know that
18   better than you?
19        A.    Yes, he would.
20        Q.    Of the approximately $40,000
21   that you believe Mr. Murphy loaned to London
22   Manhattan, did London Manhattan repay all of
23   it?
24        A.    Yes.
25        Q.    Is there any balance owed
```

 1      CHRISTOPHER d'ARNAUD-TAYLOR
 2 between either one of you at this point in
 3 time relative to any loan transactions
 4 between London Manhattan and Mr. Murphy?
 5          MR. ROTELLA:  I object to any
 6     loan transaction after September 28,
 7     2005.
 8          I move to strike any answer the
 9     witness gives regarding any loans made
10     since September 28, 2005.
11     Q.    Go ahead.
12     A.    I believe around about by
13 September 28, 2005, I think we were
14 relatively in balance.
15     Q.    What do you mean, relatively in
16 balance?
17     A.    Maybe he owed me money still.
18     Q.    How much?
19     A.    I don't know.  I can't go back
20 to 2005 for the exact amount, but I believe
21 at the point in time he owed me money.
22     Q.    Did you take any efforts to
23 collect it?
24     A.    No.
25     Q.    Did you ever ask him to pay it

CHRISTOPHER d'ARNAUD-TAYLOR

back?

    A.    No.

    Q.    Why not?

    A.    Because I am sure he would pay it back when he had it.

    Q.    Are you aware that Mr. Murphy in 2002 claimed to be worth negative $24 million?

    A.    Mr. Murphy?

    Q.    Yes.

    A.    No, I am not aware of that.

    Q.    I will show you in a little bit some financial statements of Mr. Murphy in which he claims to be worth negative $24 million in 2002. And I can't help but notice the smirk on your face.

    Can you explain that to me?

    MR. PALMER: Objection to the form.

    A.    It's just a mind-boggling figure.

    Q.    It's also mind-boggling that somebody in a negative $24 million position would be making loans to London Manhattan.

1    CHRISTOPHER d'ARNAUD-TAYLOR
2    Do you have any explanation of how a man in
3    his purported financial condition would be
4    able to do that?
5            MR. ROTELLA:  Objection to the
6        form of the question.
7            MR. PALMER:  Objection.
8        A.    No.
9        Q.    Has Mr. Murphy ever expressed to
10   you that he is broke?
11           MR. ROTELLA:  Anything post
12       9-28-05 I would object to and move to
13       strike any answer that is responsive
14       to information sent to him after that
15       date.
16       A.    I don't think he used that term
17   specifically, but I always have known him to
18   be financially challenged.
19       Q.    Are you aware of Mr. Murphy and
20   Mr. Roll having some conflicts between
21   themselves?
22       A.    I am, yes.
23       Q.    Has anybody ever told you in the
24   context of those conflicts, approximately
25   2003, 2004 Mr. Murphy announced to Mr. Roll

CHRISTOPHER d'ARNAUD-TAYLOR

 2  that he was broke?
 3        MR. ROTELLA:  Objection to the
 4     form of the question.
 5     A.    I am not privy to conversations
 6  between Mr. Murphy and Mr. Roll.
 7     Q.    Has anybody made you aware of
 8  that disclosure?
 9     A.    No.
10     Q.    You knew Mr. Murphy in the 2002,
11  2003 time frame; correct?
12     A.    Yes.
13     Q.    Did you ever -- did you witness
14  or perceive anything that in your mind
15  supported the notion that Mr. Murphy was
16  broke?
17        MR. ROTELLA:  I would like to
18     make an objection.  The witness never
19     said that he viewed him as broke.
20     Q.    Go ahead, sir.
21     A.    He moved to a very nice house in
22  Winter Park for a different situation.
23     Q.    Did you perceive that as an
24  indication that he was broke?
25     A.    I don't know if it was a

CHRISTOPHER d'ARNAUD-TAYLOR

perception he was broke. But the perception I had was that he was suffering from financial difficulty.

    Q.    Have you ever seen any of Mr. Murphy's bankruptcy filings in this case?

    A.    No.

    Q.    When did you first become aware that Mr. Murphy filed for bankruptcy?

    A.    I think when I received material relative to this case.

    Q.    That was your first awareness of it?

    A.    I think so, yes.

    Q.    Did you contact Mr. Murphy to discuss that?

    A.    No.

    Q.    Has Mr. Murphy ever independently discussed with you his bankruptcy?

    A.    It's been disclosed to Xethanol Corporation, yes.

    Q.    In what context?

    A.    In the context of him being affiliated with Xethanol.

CHRISTOPHER d'ARNAUD-TAYLOR

Q. What was your reaction to learning Mr. Murphy was in bankruptcy?

A. What do you mean, what was my reaction?

Q. You have known Mr. Murphy for some years; correct?

A. Yes.

Q. You had some business dealings with him; correct?

A. Yes.

Q. At some point in time you became aware one of your business associates was in bankruptcy; correct?

A. Yes.

Q. Did you have some reaction to that, some thought process in your mind?

A. Not really. I mean I viewed Very Smart Networks suffering and I knew he had things going wrong with real estate and so it was no big surprise to me.

Q. Let me show you another document that we will mark as Exhibit 17. This is another set of bank transactions that on page 3 indicates that on September 11, 2003 London

CHRISTOPHER d'ARNAUD-TAYLOR

Manhattan wired to Mr. Murphy $2,500.

    Do you see that?

A.    I do.

    (Bank transactions marked for identification, Exhibit 17.)

Q.    Do you have any explanation of what that transfer represents or relates to?

A.    More of the same.

Q.    Repayment of a loan?

A.    Repayment of a loan, although I think that was repayment.

Q.    Would the internal books and records of London Manhattan reflect the paydown or payoff or amortization of any loans made to London Manhattan by Mr. Murphy?

A.    Would there be debits and credits in that account that would reflect payments made by Murphy to London Manhattan, yes, I believe so.

Q.    Would there be any kind of reconciliation statement or check ledger or bank ledger or notation that would say repayment of bank loan?

A.    No.

```
 1         CHRISTOPHER d'ARNAUD-TAYLOR
 2     Q.    Repayment of private loan?
 3     A.    No.
 4     Q.    Why not?
 5     A.    Because it was a payment.
 6  Maybe, I am not quite sure.  I have to ask
 7  Mr. Skryanz, who was basically handling the
 8  account.
 9     Q.    When you expend money from the
10  corporate account, don't you keep track of
11  why the money was going out, for what
12  purpose?
13     A.    There would have been a piece of
14  paper going out from me to Mr. Skryanz.
15     Q.    Saying what?
16     A.    Instructing him to make a
17  payment.
18     Q.    Wouldn't there be something in
19  your bank reflecting a paydown of the Murphy
20  loan or repayment of the Murphy loan?
21     A.    I don't think something as
22  vigorous as that.  It would be in the
23  records, something along those lines.  I
24  don't think we regarded it as a loan.  It
25  wasn't formally a documented loan.
```