```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2   form"?
 3        A.   It's a printout of an Excel
 4   spread sheet seems to me.
 5        Q.   You mean computerized?
 6        A.   Seems to be this was a document
 7   provided to Greenberg Traurig long ago.
 8        Q.   It was provided to Greenberg
 9   Traurig?
10        A.   That was a date in which we cut
11   off the stockholders list for when we did our
12   reverse merger.
13        Q.   To whom at Greenberg Traurig did
14   you submit Exhibit 24?
15        A.   Spencer Feldman.  This is the
16   time we were cutting off the stockholders
17   list for the reverse merger.
18        Q.   At which office was Mr. Feldman?
19        A.   I don't know, but he used to be
20   here.
21        Q.   New York?
22        A.   Yes.
23        Q.   Did you produce Exhibit 24 to
24   Mr. Feldman in connection with the Murphy
25   bankruptcy?
```

162

| | |
|---|---|
| 1 | CHRISTOPHER d'ARNAUD-TAYLOR |
| 2 | A.   No. |
| 3 | Q.   Sir, let me hand you something |
| 4 | we will mark as Exhibit 25. |
| 5 | It appears to be a printout from |
| 6 | the Florida Department of State concerning |
| 7 | Trafalgar Resources. |
| 8 | Have you ever seen this before? |
| 9 | A.   Yes. |
| 10 | (Printout marked for |
| 11 | identification, Exhibit 25.) |
| 12 | Q.   On the second page it identifies |
| 13 | you as COB; do you see that? |
| 14 | A.   I see that. |
| 15 | Q.   What do you understand that to |
| 16 | be? |
| 17 | A.   I am sorry. |
| 18 | Q.   What do you understand COB to |
| 19 | mean? |
| 20 | A.   I have no idea. |
| 21 | Q.   Sir, it appears this entity was |
| 22 | created on August 31, 2004. |
| 23 | Do you see that on the first |
| 24 | page? |
| 25 | A.   Yes, I do. |


162

1   CHRISTOPHER d'ARNAUD-TAYLOR
2        A.    No.
3        Q.    Sir, let me hand you something
4   we will mark as Exhibit 25.
5              It appears to be a printout from
6   the Florida Department of State concerning
7   Trafalgar Resources.
8              Have you ever seen this before?
9        A.    Yes.
10             (Printout marked for
11        identification, Exhibit 25.)
12       Q.    On the second page it identifies
13  you as COB; do you see that?
14       A.    I see that.
15       Q.    What do you understand that to
16  be?
17       A.    I am sorry.
18       Q.    What do you understand COB to
19  mean?
20       A.    I have no idea.
21       Q.    Sir, it appears this entity was
22  created on August 31, 2004.
23             Do you see that on the first
24  page?
25       A.    Yes, I do.

LEGALINK, A MERRILL CORPORATION
(800) 325-3376    www.Legalink.com

CHRISTOPHER d'ARNAUD-TAYLOR

Q. Is that consistent with your recollection of the timing of this entity's creation?

A. It's consistent.

Q. Are there any shareholder agreements that relate to this entity?

A. There were a pile of shareholder agreements being negotiated, but none put into effect and no subscriptions made.

Q. And none were ever signed?

A. I don't believe so. My recollection is they were all in the process of discussion, negotiation when events overtook it.

Q. Did you ever contribute any capital to Trafalgar Resources?

A. No.

Q. To your knowledge, did Mr. Murphy ever contribute any resources to Trafalgar Resources?

A. No.

Q. To your knowledge, did anybody contribute any resources to this entity?

A. To my knowledge, no.

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2        Q.    How did the company get formed?
 3        A.    I think Mr. Murphy formed it or
 4   Bob Davis formed it.
 5        Q.    Who is Bob Davis?
 6        A.    Bob Davis was an accountant
 7   working with Mr. Murphy.
 8        Q.    The address of the entity is 50
 9   North Laura Street, Suite 1700, in
10   Jacksonville.  What address is that?  What is
11   there?
12        A.    At that time it was a suite of
13   offices used by Mr. Murphy and the
14   aforementioned Trafalgar Capital.
15        Q.    Did you ever go to that office?
16        A.    Yes.
17        Q.    Were these offices on an entire
18   floor of this building?
19        A.    I don't think they took up an
20   entire floor, but they took up a -- they were
21   a reasonably large office suite.
22        Q.    Are you aware that Mr. Murphy
23   was in bankruptcy as of the date this entity
24   was created?
25        A.    I wasn't then.
```

CHRISTOPHER d'ARNAUD-TAYLOR

Q. He never disclosed that to you in connection with Trafalgar Resources?

A. No.

MR. ROTELLA: Do you mind if I ask if a follow up question on Trafalgar now rather than waiting?

MR. SPIVEY: I would rather you wait.

Q. Sir, let me show you what we will mark as Exhibit 26.

This appears to be a fax from Mr. Railly to you at Xethanol Corporation dated February 3, 2004.

Have you ever seen this before?

A. I believe I did.

(Fax marked for identification, Exhibit 26.)

Q. Are you aware of Mr. Skryanz requesting Mr. Railly to provide a statement concerning whether the Julian C. Murphy Revocable Trust was an accredited investor?

A. I know that Mr. Skryanz at the time was going through the process of establishing the accredited nature of the

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2   investigator.
 3        Q.   What is your understanding of
 4   what is an accredited investor?
 5        A.   I believe someone whose net
 6   worth is more than $1 million, whose income
 7   is more than $200,000.  I don't know
 8   precisely, but Mr. Skryanz was working with
 9   the company's auditors at the time, going
10   through the books.
11        Q.   What was the purpose or the
12   need, as you understood it, to be asking for
13   some statement concerning whether the Julian
14   Murphy Revocable Trust was an accredited
15   investor?
16        A.   I don't have a specific
17   recollection of it, but I do know at the time
18   that Mr. Skryanz was working directly with
19   the auditing firm, that we had to make sure
20   that our books were appropriate.
21        Q.   I notice that the date of this
22   fax to you is about the same time that
23   Mrs. Murphy was explaining to Mr. Skryanz the
24   $175,000 loan transaction at First Florida
25   Bank?
```

CHRISTOPHER d'ARNAUD-TAYLOR

A.  Yes.

Q.  Does Exhibit 26 have any connection to that dispute or controversy?

A.  I would make an educated guess that the two are related, yes, since an investment was made of $50,000.

MR. ROTELLA:  Move to strike the guess.

Q.  How would the Julian C. Murphy Revocable Trust being accredited or nonaccredited bear upon the issues surrounding the loan transaction from First Florida Bank?

A.  I don't know.

Q.  Have you ever seen the affidavit that appears on pages 3 and 4 of Exhibit 26?

A.  I don't believe I have seen it, but I would if I faxed it, it would have gone straight to Franz.

Q.  Let me ask you to take a look at it now, please.

In paragraph 3 it says, "In January 2002 she," meaning Julian C. Murphy, and John J. Murphy, Jr. directed Thomas A.

CHRISTOPHER d'ARNAUD-TAYLOR

Thomas, CPA to obtain 750,000 shares of Xethanol Corporation common stock as a trust asset. Said transaction was completed as directed."

    Do you see that?

A. I do.

Q. We have looked at the ledger summary earlier where stock certificate number 40 was dated December 1, 2001; correct?

A. I believe so.

Q. How does that square with Mrs. Murphy's sworn statement that she directed Thomas A. Thomas to obtain the 750,000 shares in January of 2002?

A. I would hazard to guess it relates to payment, but I don't really know. It was a quick answer.

Q. The fact the stock was issued in December of 2001; is that correct?

A. I believe so.

Q. Let's talk about payment.

    Do you know how the 750,000 shares were paid for?

1    CHRISTOPHER d'ARNAUD-TAYLOR
2    A.   No, I believe this is going back
3    a long time.  I think the original intent was
4    that the 750 would be for services.
5    Q.   Services by whom?
6    A.   Murphy.
7    Q.   John J. Murphy?
8    A.   Yes.
9    Q.   You said that was the original
10   intent?
11   A.   Yes.
12   Q.   Did it change?
13   A.   Not really, I don't think so.  I
14   can't recall is the quick answer, but the
15   objective of doing business with John Murphy
16   at that time was related to tax credit
17   financing, in which he had some expertise.
18   Q.   Do you know whether anyone
19   actually paid Xethanol Corporation any money
20   for the issuance of the 750,000 shares
21   reflected by stock certificate 40?
22   A.   I don't think so.
23   Q.   You think that that stock was
24   issued in exchange for Mr. Murphy, John J.
25   Murphy, Jr., providing services to the

```
 1        CHRISTOPHER d'ARNAUD-TAYLOR
 2   company in the future?
 3           MR. ROTELLA:  Objection to the
 4      form of the question.
 5        A.    Certainly that was the original
 6   intent.
 7        Q.    Would there be, sir, any
 8   documentation that would reflect such an
 9   intent?
10        A.    No, I don't think so.
11        Q.    Have you looked?
12        A.    My recollection is that there
13   isn't.  I can look.
14        Q.    Do you know whether there would
15   be an e-mail from somebody to somebody
16   talking about that intent?
17        A.    There may be.
18        Q.    What was the approximate value
19   per share of Xethanol stock in December of
20   2001?
21        A.    The company had no value.
22        Q.    Were you selling stock in the
23   company?
24        A.    We were in December 2001, we
25   were forming the company as a basis for going
```