CHRISTOPHER d'ARNAUD-TAYLOR

1
2  forward.  Then we were selling stock and I
3  think that is why it came down to 10 cents a
4  share and things like that.
5      Q.   When did you first sell stock in
6  Xethanol?
7      A.   2000 -- December 23, 2001.
8      Q.   What was the selling price of
9  Xethanol stock in December 2001?
10     A.   I believe it was 10 cents a
11 share.  I have no recollection.  It's in the
12 filings.
13     Q.   Thomas A. Thomas as trustee got
14 750,000 shares of this stock in December of
15 2001; correct?
16     A.   That would be the case, yes.
17     Q.   And using 10 cents a share as an
18 evaluation, that would be worth $75,000?
19     A.   Except that that transaction
20 took place before we raised some money at 10
21 cents a share.
22     Q.   But the stock was issued in
23 December of 2001; right?
24     A.   Yes, beginning of 2001 --
25 beginning of December 2001.  And it wasn't,

CHRISTOPHER d'ARNAUD-TAYLOR

1
2  the stock was not sold until later on in
3  December. So the 750,000 was issued prior to
4  the issuance of stock for money.
5      Q.   But using the 10 cents a share
6  evaluation?
7      A.   If you wanted to, you could do
8  that.
9      Q.   It would be $75,000?
10          MR. PALMER: Objection to the
11      form.
12     A.   I don't see why you would use
13  the 10 cents evaluation, but if you wanted
14  to, that is what it would be.
15     Q.   What would you use?
16     A.   At the time the company was
17  worth nothing.
18     Q.   Let me see if I understand this.
19          Mr. Murphy was going to provide
20  services to the company and in exchange get
21  shares that, in your testimony, were
22  worthless?
23          MR. ROTELLA: Objection to the
24      form of the question, mischaracterizes.
25     A.   He is getting first round shares

```
 1          CHRISTOPHER d'ARNAUD-TAYLOR
 2    of a company with the intention of becoming
 3    valuable.
 4          Q.    At some point those shares did
 5    acquire value, did they not?
 6          A.    They did acquire value.
 7          Q.    What was the maximum number
 8    value of shares for Xethanol stock subsequent
 9    to December 1, 2001?
10          A.    $16 a share, I think.
11          Q.    At what point in time were the
12    shares $16?
13          A.    About four months ago.
14          Q.    What was the approximate share
15    value of Xethanol stock in the 2003, 2004
16    time frame?
17          A.    It was a private company at the
18    time.  Stock issuances were generally around
19    about 75 cents a share.
20          Q.    Was there any understanding,
21    sir, as to how long Mr. Murphy was supposed
22    to perform services for Xethanol in the
23    exchange of the 750,000 shares?
24          A.    The services really were
25    targeted being a one-off piece of advice and
```

CHRISTOPHER d'ARNAUD-TAYLOR

counseling on raising capital through tax credits, which was his area, stated area of expertise, and that was an area which we were using at that time. That was a whole area we were looking at to capitalize the company.

Q. You said "one-off," what do you mean?

A. You had to identify a source of tax credit financing.

Q. Did he do that?

A. No, he didn't.

Q. Did you ever utilize any such financing?

A. No, but we tried our hardest to find such financing and we retained your firm to do it.

Q. But did you find any?

A. They didn't find any either.

Q. Did Mr. Murphy lead you to any such financing?

A. No.

Q. Have you ever met Mrs. Murphy?

A. I have.

Q. Do you know anything about her

1   CHRISTOPHER d'ARNAUD-TAYLOR

2  background?

3      A.   Not a lot.

4      Q.   Anything about her educational

5  or work history?

6      A.   No.

7      Q.   Did she ever perform any

8  services for Xethanol?

9      A.   No.

10     Q.   No?

11     A.   No.

12     Q.   How about Thomas A. Thomas, has

13 he ever performed any services for the

14 company?

15     A.   No.

16     Q.   Is there a reason then that the

17 750,000 shares of stock were issued to Thomas

18 A. Thomas as trustee?

19     A.   Just that we were instructed to

20 do that.

21     Q.   By whom?

22     A.   By Murphy.

23     Q.   Mr. Murphy?

24     A.   Yes.

25     Q.   Did Julian Murphy ever instruct

CHRISTOPHER d'ARNAUD-TAYLOR

1  
2  you to issue any shares to Thomas A. Thomas  
3  as trustee?  
4     A.   No.  
5     Q.   Did anybody ever indicate why  
6  the 750,000 shares should not be issued in  
7  the name of Mr. Murphy directly?  
8     A.   No.  
9     Q.   This affidavit of Julian Murphy  
10 is dated January 28, 2004.  
11     Do you see that?  
12    A.   On Exhibit 26.  
13         MR. PALMER:  What exhibit are we  
14    on?  
15         MR. SPIVEY:  26.  
16    A.   Yes, January 28, 2004.  
17    Q.   To your knowledge, did anybody  
18 at Xethanol undertake any steps to confirm  
19 the accuracy of the statements set forth in  
20 the agreement?  
21    A.   Not to the best of my knowledge.  
22 I wasn't directly involved in that.  Maybe  
23 Mr. Skryanz did, maybe he didn't.  
24    Q.   In paragraph 7 Mrs. Murphy  
25 states that she has business and financial  

LEGALINK, A MERRILL CORPORATION
(800) 325-3376      www.Legalink.com

CHRISTOPHER d'ARNAUD-TAYLOR

experience including services such as a vice-president of a public health corporation.

    Do you know what entity that would be?

    A.   No.

    Q.   It says "namely Hospital Corporation of America."

    A.   No.

    Q.   Do you know whether she was, in fact, vice-president of the public health corporation known as Hospital Corporation of America?

    A.   No.

    Q.   You know Mrs. Murphy is a former airline stewardess?

    A.   I didn't know.

    Q.   Sir, let me show you what will be marked as Exhibit 27.

    A.   Okay.

    (Two letters marked for identification, Exhibit 27.)

    Q.   Sir, have you had a chance to look at Exhibit 27?

CHRISTOPHER d'ARNAUD-TAYLOR

A. I have.

Q. They are two separate letters. The second one is dated January 15, 2004 and appears to have been faxed by Patrick Railly to John Murphy on January 16, 2004.

Do you see the fax box in the left-hand corner?

A. I do.

Q. And then the first two pages of the exhibit appear to be a letter that Julian Murphy actually signed.

Do you see that?

A. I do.

Q. Do you recognize Julian Murphy's signature?

A. No.

Q. Do you have any reason to believe that is not her signature?

A. No.

Q. It appears that Patrick Railly drafted this letter for Ms. Murphy's signature, which letter was then transformed to her residential address in Richmond Hill, Georgia, and she signed it.

CHRISTOPHER d'ARNAUD-TAYLOR

    MR. PALMER: Objection to the form.

Q. Do you have any reason to disagree with that characterization of these documents?

    MR. ROTELLA: Objection to the form of the question.

A. I have no idea.

Q. Do you know why Exhibit 27 was sent to Mr. Skryanz on January 15th or 16th, 2004?

A. I believe it all related to the loan transaction and Mr. Skryanz working with our auditors to establish the appropriate documentation.

Q. Now, we know from Exhibit 2 that Mrs. Murphy sent another letter to Mrs. Skryanz on February 11, 2004 regarding the same subject matter; correct?

A. I believe so.

Q. Do we know why Exhibit 27, dated January 15, 2004 was not satisfactory?

A. I don't know why it was not satisfactory. I am assuming it probably

1   CHRISTOPHER d'ARNAUD-TAYLOR
2   wasn't.
3       Q.   Were you still ballistic as of
4   January 14, 2004?
5       A.   No.
6       Q.   What was your state of mind at
7   that time?
8       A.   Bogged down in the process of
9   the audit.
10      Q.   I am sorry?
11      A.   Bogged down in process of the
12  audit.
13      Q.   Sir, let me show you what we
14  will mark as Exhibit 28.  It appears to be a
15  letter from Mr. Rotella to you dated May 5,
16  2004.
17           Have you ever seen this letter
18  before?
19      A.   I believe I have.
20           (Letter dated 5-5-04 marked for
21      identification, Exhibit 28.)
22      Q.   It says, "Dear Mr. Taylor.  From
23  the information that I have been provided, I
24  am satisfied there was no violation of law
25  when the Julian C. Murphy Revocable acquired