1    CHRISTOPHER d'ARNAUD-TAYLOR

2         A.    -- or the underlying securities

3    that it represents?

4         Q.    Let's start with the

5    certificates themselves.

6              Have you ever seen these before?

7         A.    Yes, I believe I signed them.

8         Q.    Is that your signature on the

9    lower right-hand corner of each one?

10        A.    Yes.

11        Q.    Let's go through each one if we

12   can and just tell me what you understand them

13   to mean, and to the extent, if you can, sir,

14   help me to understand how they correspond to

15   your summary sheet, which is part of

16   Exhibit 2.

17        A.    If you have a better copy or

18   better eyes than I do, can you read out the

19   number, is it 72?

20        Q.    It appears to be 72.

21        A.    And the amount 275,000, that

22   would appear to be Thomas A. Thomas, trustee.

23        Q.    Is there anything on this

24   document that enables you to say which trust

25   Mr. Thomas is acting on behalf of?

222

CHRISTOPHER d'ARNAUD-TAYLOR

1
2          MR. ROTELLA:  I object.  On the
3      document, on the second page appears
4      to be --
5          MR. SPIVEY:  Stop, Ray.  Ray,
6      you could cross-examine him if you
7      wish.
8          MR. ROTELLA:  It's not a
9      complete document.  Parts were cut
10     off.
11         MR. SPIVEY:  Let me say this,
12     Ray.  I didn't receive any of these
13     documents from Xethanol.  They had a
14     complete failure to respond to my
15     subpoena.
16         These are records that I had
17     cobbled together from third-party
18     sources.  The best I could do under
19     the circumstances.  We are going to
20     come back to New York to depose more
21     Xethanol representatives.  So bear
22     with me.  I'm doing all I can.
23         MR. ROTELLA:  I understand.
24     Q.   Sir, on the first page of
25   Exhibit 37, is there anything on that that

CHRISTOPHER d'ARNAUD-TAYLOR

indicates which trust Mr. Thomas is trustee of?

A.    Nope.

Q.    Let's go to the next one, which appears to be certificate 73.  Tell me what that is.

A.    125,000 shares to Thomas A. Thomas, trustee.

Q.    Let's go to the next one, which appears to be 87.

A.    Thomas A. Thomas, trustee, for 127,000 shares.

Q.    Let me stop you right there. Between stock certificate 73 and stock certificate 87 there is a gap of 13 or 14 certificates; right?

A.    Yes.

Q.    Did other people acquire those intervening certificates?

A.    I would assume so, but I don't know so.  But these weren't the only people we were doing business with.

Q.    I understand.

       The next one appears to be

CHRISTOPHER d'ARNAUD-TAYLOR

number 110.  Tell me what that is.

     A.     Patrick A. Railly 110, 300,000

shares.

     Q.     This one has "as trustee"

written in pen.  Do you see that?

     A.     I do.

     Q.     Do you know who or when that

happened?

     A.     I don't.

     Q.     This stock certificate is not

dated.  Do you see that?

     A.     I do see that.

     Q.     Do you have any explanation for

that?

     A.     Sloppiness.

     Q.     Is that your signature?

     A.     It's my signature on the right,

yes.

     Q.     The next pages are seemingly

some e-mails that were cut off.

            Do you have any understanding of

what those are?

     A.     Yes, Ross Tottenham was an

original stockholder in the predecessor

1    CHRISTOPHER d'ARNAUD-TAYLOR

2    corporation to Xethanol.  As I mentioned to

3    you, there were existing stockholders in

4    there.  So the communication was with me

5    concerning the conversion of London

6    Manhattan.com into Xethanol Corporation.

7        Q.    Let's fast forward a little bit

8    until you get to the stock certificate that

9    bears 0132 in the lower right-hand corner.

10        That is a better copy of the

11    same canceled stock certificate number 40.

12        A.    Yes.

13        Q.    Look at the next page and tell

14    me what you understand that to be.

15        A.    I think that was the original

16    document.  That was the original explanatory

17    document relating to the issuance of the

18    stock.

19        Q.    And it says issued to Thomas A.

20    Thomas, trustee, and then beneath it says

21    paren Murphy.

22        A.    Yes.

23        Q.    What does that mean to you?

24        A.    Is says here that Thomas A.

25    Thomas, trustee and it relates to Murphy.

1    CHRISTOPHER d'ARNAUD-TAYLOR

2        Q.    Do you know which Murphy?

3        A.    No.

4        Q.    You said something earlier in

5    your deposition, sir, that you may have a

6    formal stock ledger book that would provide

7    more detail on --

8        A.    It should do.

9        Q.    That is not what you're talking

10   about with reference to page number 0133, is

11   it?

12       A.    Where is 0133?  I am sorry, I

13   have it.  It will have this and sometimes it

14   will have additional pieces of paper that

15   relate to the actual stock reissuance.  That

16   is what would be in the stock ledger book.

17       Q.    Sir, let's go to Bates number

18   0168.  Do you see that?

19       A.    I have it.

20       Q.    All of this, for the benefit of

21   the record, is within Exhibit 37.

22             Can you tell me what those

23   notations mean?

24       A.    It says "Cancel certificate" and

25   it says "Replaced by 87, 88 and 89."

1       CHRISTOPHER d'ARNAUD-TAYLOR

2       Q.      Specifically above that it says

3   "Issued to Thomas A. Thomas, trustee" and

4   then underneath that it says -- does that say

5   "Replace"?

6       A.      It says, I would think it says

7   "Replace TAT."

8       Q.      Meaning it was issued originally

9   to Thomas A. Thomas?

10      A.      Yes.

11      Q.      Without the trustee language?

12      A.      I would think that was just an

13  abbreviation.

14      Q.      Sir, have you ever heard of

15  Folcome Properties?

16      A.      I heard of them.

17      Q.      What do you know of Folcome

18  Properties?

19      A.      I believe it was -- I don't know

20  anything about Folcome Properties itself, but

21  I believe it was a friend of Mr. Murphy's.

22      Q.      The company was a friend of

23  Mr. Murphy's or the principal of Folcome

24  Properties was?

25      A.      The principal.

1    CHRISTOPHER d'ARNAUD-TAYLOR

2        Q.    Do you understand who the

3    principal was?

4        A.    No.

5            MR. SPIVEY:   Counsel, I would

6        like to talk about the possibility of

7        getting supplemental responses to the

8        subpoena and rescheduling a deposition

9        of Mr. Skryanz.

10           MR. PALMER:   Is that something

11       you would like to have on the record?

12           MR. SPIVEY:   I would if we can.

13           MR. PALMER:   I think I already

14       said we will get you the documents you

15       are looking for at the end of next

16       week, within your September deadline.

17           MR. SPIVEY:   Ray, are you able

18       to get back up here?

19           MR. ROTELLA:   Let's see when we

20       are doing it.   I understand you're not

21       asking him to reproduce what we saw

22       today, other than these things which

23       we cannot read, like these stock

24       certificates.   I want better copies.

25           MR. SPIVEY:   I am not asking for

CHRISTOPHER d'ARNAUD-TAYLOR

any duplication that we have seen.

But I am asking for there are

documents we have not seen.

MR. ROTELLA:  Let's do this,

let's see what he brings.  We both

have to be here.  Maybe I could be on

the telephone.  Given what has

happened here, in fairness, if it goes

past the 28th, I understand to reset

again.

MR. SPIVEY:  It's the 22nd.

MR. ROTELLA:  We have

Mr. Skryanz, we don't know when he is

getting out of the hospital or so.

MR. PALMER:  You are not going

to want to depose Mr. Skryanz until

you get the documentation.

MR. SPIVEY:  No, we need the

documentation.

MR. PALMER:  I imagine that is

something you have to work out

yourself, but you will probably want

to extend the order.

MR. SPIVEY:  Can we do it?  That

1    CHRISTOPHER d'ARNAUD-TAYLOR

2        is all I've got, Ray.  You are welcome

3        to cross-examine.

4            MR. ROTELLA:  Yes, I have some

5        questions.

6    EXAMINATION BY MR. ROTELLA:

7        Q.    Mr. Taylor, I want to talk to

8    you about the relationship either you or one

9    of your business entities had with the

10   Greenberg Traurig law firm.

11           To the best of your knowledge,

12   when did the Greenberg Traurig law firm

13   undertake to either represent you personally

14   or any business entity you have been related

15   to or affiliated with?

16       A.    I can't give you the exact date,

17   but I believe it was in 2003, 2004, at some

18   stage, and they became corporate counsel for

19   Xethanol Corporation.

20       Q.    Now, when you say they became

21   corporate counsel, was that related to the

22   company going public?

23       A.    It was related to the company's

24   affairs in general and became specifically

25   securities counsel in connection with the