CHRISTOPHER d'ARNAUD-TAYLOR

company going public with the reverse merger.

    Q.    Would it be fair to say that if there was a corporation problem relating to stock, that you would look to Greenberg Traurig to help you?

    MR. SPIVEY: Objection to the form.

    A.    No.

    Q.    No?

    A.    We discontinued our relationship with Greenberg Traurig.

    Q.    When did that happen?

    A.    Must have been six months ago, six months ago.

    Q.    What was the reason for that?

    A.    Money.

    Q.    You owed them money?

    A.    No, it was just expensive.

    Q.    Too expensive for you?

    A.    Yes.

    Q.    When you discontinued your relationship with the Greenberg Traurig law firm, did they return to you all records and documents that Xethanol had provided to them?

CHRISTOPHER d'ARNAUD-TAYLOR

    A.    I couldn't tell you what documents that we had given to them that they had to return. But it wouldn't have been returned to me, probably be returned to Mr. Skryanz or our chief financial officer.

    Q.    During the time that the decision was made to go public --

    A.    Yes.

    Q.    -- as I understand, Greenberg Traurig was the firm that did the necessary paperwork to accomplish that?

    A.    Yes.

    Q.    To the best of your knowledge, during the time that Greenberg Traurig worked on going public for Xethanol, did you ever have occasion to meet with any lawyers in this firm while Mr. Murphy was present?

    A.    Me, personally, I don't think so.

    Q.    Do you think Mr. Murphy may have been present in this law firm to meet representatives of Greenberg Traurig with representatives of Xethanol?

    MR. SPIVEY: Objection to the

1        CHRISTOPHER d'ARNAUD-TAYLOR
2    form.
3        A.   I believe he may have done.
4        Q.   And why do you have that belief,
5    sir?
6        A.   Because I have a recollection
7    that such a meeting did take place, the
8    precise time and purpose of which I cannot
9    remember.
10       Q.   Other than Mr. Feldman, what
11   other lawyers have you interacted with at
12   Greenberg Traurig in your tenure with
13   Xethanol?
14       A.   Mr. Kenneth Zukorbraut.
15       Q.   Kenneth --
16       A.   Z-U-K-OR-B-R-A-U-T.
17       Q.   What did you understand his
18   legal capacity to be as it related to
19   Xethanol.  What kind of work did he do?
20       A.   He was our lead counsel here.
21       Q.   What other lawyers do you recall
22   meeting with or having contact with
23   concerning Xethanol at the Greenberg Traurig?
24       A.   Jeff Mann, who was the lead
25   litigator.

CHRISTOPHER d'ARNAUD-TAYLOR

Q. You believe there was some litigation where Mr. Mann represented Xethanol?

A. No, we consulted Mr. Mann on issues which may have led to litigation.

Q. What other lawyers did you meet with here representing Xethanol?

A. I met with an employment lawyer once.

Q. What was his name?

A. I can't remember. And also we handled our intellectual property through this firm with a lawyer called Gene Rzcidlo, who is no longer with the company.

Q. You earlier mentioned a lawyer that you dealt with in securities?

A. Spencer Feldman. We also dealt with the Miami office on tax credit matters. I can't remember the name of the person who handled that right now.

Q. Is this the first time you have ever been to the law office we are in today?

A. The first time I have ever been to what?

CHRISTOPHER d'ARNAUD-TAYLOR

    Q.    In this Greenberg Traurig office that we are in today?

    A.    No, I have been in this office regularly.

    Q.    What would you consider regularly?

    A.    I would think an average -- I don't know. When I was here when I was working mostly with them, could be anywhere from two times a week.

    Q.    During the time that Greenberg Traurig represented Xethanol, did you provide them with full disclosure of everything that they asked of you that was needed in order to take the company public?

    A.    Absolutely, we gave them everything we could.

    Q.    Included in that discussion, or did that include information about Mr. Murphy and his bankruptcy?

    A.    Nope, because I didn't know about Mr. Murphy and his bankruptcy and at that time Mr. Murphy was not affiliated with the firm.

|   |   |
|---|---|
| 1 | CHRISTOPHER d'ARNAUD-TAYLOR |

2   Q.   Prior to the time that you terminated the services of Greenberg Traurig, did you learn about Mr. Murphy's bankruptcy?

5   A.   No.

6   Q.   You indicated earlier that one of the things that Mr. Murphy was working on doing for Xethanol was to obtain money through tax credits.

10   Do you recall that?

11   A.   I do.

12   Q.   And I belive you indicated that the intent was that in exchange for the tax credit work, Mr. Murphy would obtain stock certificates from Xethanol?

16   MR. SPIVEY:   Objection to the form.

18   Q.   Is that what you testified to earlier?

20   A.   I think that was partially the intent. Nothing was as clean-cut as that. The intent was he was working for us in terms of original capital tax credit financing.

24   Q.   In working on the tax credits, was there a lawyer at Greenberg Traurig who

```
 1            CHRISTOPHER d'ARNAUD-TAYLOR
 2   was responsible to aid in obtaining the
 3   necessary legal representation relative to
 4   the tax credits?
 5        A.   The Greenberg Traurig
 6   relationship with us and the tax credits was
 7   unrelated to Mr. Murphy.  There is in
 8   Greenberg Traurig's Miami office an expert on
 9   tax credits and he worked with us.
10        Q.   Did you tell me Mr. Murphy did
11   not work with the Greenberg Traurig firm on
12   in Miami on tax credits?
13        A.   No.
14        Q.   You're not telling me that?
15        A.   I am telling you he didn't.
16        Q.   Did Spencer Feldman work in the
17   tax credit field?
18        A.   No.
19        Q.   Taking us back again to the
20   question I discussed a minute ago, is it fair
21   to say that if the tax credits were not
22   obtained by Mr. Murphy, that he was not to
23   get stock?
24        A.   No.
25        Q.   That wasn't the understanding?
```

CHRISTOPHER d'ARNAUD-TAYLOR

A. No.

Q. Other than what is in the actual stock records, do you know of any other certificates where there is an actual stock certificate issued to John Murphy; have you seen such a document?

A. I don't think so.

Q. The auditors and apparently the legal problems that related, do you agree with me that they were all relative to the stock that was issued to Patrick Railly or Thomas A. Thomas concerning the Julian Murphy Trust?

   MR. SPIVEY: Objection to the
   form.

Q. Was I not clear on that question?

   MR. PALMER: Can you repeat it?

Q. Let me try again.

   Would you agree with me -- well, first of all, agree we have seen no documents where anyone has asked the John Murphy Trust to go back and provide information to auditors concerning stock issued to a John

CHRISTOPHER d'ARNAUD-TAYLOR

Murphy Trust?

       MR. SPIVEY:  Objection to the form.

A.   I think you are right.

Q.   Do you know of any documents whereby auditors have asked the John Murphy Trust to provide information about any stockholders?

A.   No.

Q.   Am I correct to say that the only stockholder that the auditors asked to go back and review the transaction was a stockholder known as the Julian Murphy Trust, through that trustee?

       MR. SPIVEY:  Objection to the form.

A.   It would appear to be the situation, yes.

Q.   If a problem results with the taking of the company public, in the stock that was issued, would you go back to Greenberg Traurig for representation to straighten that out at Xethanol?

A.   I don't understand your

CHRISTOPHER d'ARNAUD-TAYLOR

question.

Q. Okay. If in the future there is a problem with any of the stock, publicly issued stock that was done while Greenberg Traurig represented Xethanol, would you go back to Greenberg Traurig to retain them to straighten out whatever that problem was concerning the stock?

A. I don't know. I would have to take advice on that.

Q. Would you go to Exhibit 32 and 33 again.

Would I be correct in saying that when you gave answers to Mr. Skryanz concerning 31 and 32, you were doing so only as a reader of the document and not as someone with knowledge of accounting; would that be fair to say?

A. Yes.

MR. SPIVEY: Objection to the form.

Q. As we sat here today in the office of Greenberg Traurig, what was your comfort level of being in the law office that